UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIE M. CLAY,

               Petitioner,

    v.

ROBERT NEUSCHMID, et al.,

               Respondent.

Case No. 19-cv-06320-HSG

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OFAPPEALABILITY**

Before the Court is the amended petition for a writ of habeas corpus of Petitioner Willie M. Clay, brought pursuant to 28 U.S.C. § 2254, challenging the validity of his state court conviction. Dkt. No. 10. Respondents have filed an answer to the petition. Dkt. Nos. 21–26. For the reasons set forth below, the petition is DENIED.

## I.      PROCEDURAL HISTORY

On June 21, 2013, a Contra Costa County jury convicted Petitioner of first-degree murder, with the special circumstance of lying in wait, and found Petitioner had personally discharged a firearm resulting in death of another. Dkt. No. 22-8 at 188–89. Petitioner was sentenced to life without the possibility of parole plus 25 years to life for the firearm enhancement charge. Dkt. No. 22-9 at 4.

Petitioner appealed his conviction to the California Court of Appeal. On April 10, 2018, the California Court of Appeal affirmed the judgment of conviction but vacated the sentence and remanded to allow the trial court to consider whether to strike or impose the firearm discharge enhancement. *See People v. Clay*, 2018 WL 1735787 (Cal. Ct. App. Apr. 10, 2018), *as modified* (May 2, 2018).[1] On June 27, 2018, the California Supreme Court summarily denied review. Dkt. No. 22-35 at 94.

---

[1] The state court's opinion was modified slightly to fix a minor error. The judgment was not altered. *See* Dkt. No. 22-34 at 2.

On October 3, 2019, Petitioner filed a habeas petition with this Court, Dkt. No. 1, but was subsequently granted leave to stay his petition to exhaust an additional three claims Dkt. No. 7. Petitioner filed a habeas petition in the California Supreme Court, which was summarily denied on January 22, 2020.  Dkt. No. 22-36 at 3.  On March 17, 2020, Petitioner filed an amended federal habeas petition that commenced the instant action.  Dkt. No. 10.

## II.    STATEMENT OF FACTS

The following factual background is taken from the April 10, 2018 opinion of the California Court of Appeal.[2]

### 1. The Killing of Lloyd Gary Townsend

At approximately 5:45 p.m. on April 27, 2009, Lloyd Gary Townsend left a medical appointment in Antioch where he had attended a prenatal ultrasound with his girlfriend, Amber Barbosa, who was seven months pregnant.  Townsend had parked his motorcycle at a nearby 7–Eleven.  He retrieved his motorcycle and began to pull out of the parking lot.

Clay, who had been hiding behind the 7–Eleven, approached Townsend from the rear and fired three shots at Townsend's back from approximately 12 feet away.  Clay then came closer and fired a couple more shots at Townsend's back from about six feet away.  Townsend fell off the motorcycle onto his left side.  Clay walked around the motorcycle, stood over Townsend's body, put the gun to the back of Townsend's neck, and shot him two or three more times.  After killing Townsend, Clay crossed the street through an opening in a hedge that led to a nearby parking lot.  He got into a dark BMW and drove away.

Numerous witnesses saw Clay kill Townsend.  One witness, Steven Siegfried, who had been driving by, took a picture of Clay and followed him when he drove off.  Some of the witnesses called 911.  When the police arrived, they unsuccessfully tried to revive Townsend.  No weapon was found on or near Townsend's body.  An autopsy revealed Townsend had been shot nine times, including three times in the back of the head and neck.

### 2. Clay's Arrest at Kesha Jones's House

After following the BMW, Siegfried saw it pull into the driveway of a house half a mile away and saw Clay go into the house.  Siegfried

---

[2] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of the facts is supported by the record, and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order.

United States District Court
Northern District of California

called 911 and waited for the police to arrive.  After they arrived, Clay remained in the house for about an hour, but then came out and surrendered.  The house was then searched with the resident's consent.  The resident was Kesha Jones, who had known Clay for 27 years and considered him her husband.  It appears Clay sometimes stayed at her house and kept a few possessions there.

When Clay first entered the house after shooting Townsend, he told Jones, "I'm going to jail."  Clay doused the gun and his hands in bleach, wrapped the gun in a plastic bag, and took a shower. Afterwards he handed the gun in the plastic bag to Jones's 14–year–old daughter and told her to take it over the backyard fence.  She did as she was told but was apprehended by the police as she climbed over the fence.  As she was being searched, she volunteered, "I have the gun."  After the police retrieved the gun, they questioned her, and she explained that Clay was her mother's boyfriend and he had instructed her to take the gun over the back fence.

During the search of the house, a flip video camcorder with recorded videos was found in Clay's gym bag, seized, and the videos were subsequently viewed by the police after a search warrant was obtained.  As we shall discuss in more detail, several of those videos were played for the jury over defense objection, and the admission of two of them is challenged on appeal.

3. The Relationship Between Clay and Townsend and the Death of Clay's Son

Clay and Townsend had been friends for many years.  For a time, in 2005 and 2006, both worked at Bayside Funding Group (Bayside). Bayside was owned by Barbosa and her then-husband, Phillip Kuspard.  Around 2007, Barbosa began a romantic relationship with Townsend, eventually left Kuspard for Townsend, and was pregnant with Townsend's baby when he was killed.

In approximately 2005, Townsend and Clay started a motorcycle club together called "Made Men Motorcycle Club" (Made Men).  By late 2005 or 2006, however, Clay and Townsend had a serious falling out, and Clay resigned from the club.  The two men also feuded when they worked at Bayside because Townsend expected Clay to give him a cut of Clay's referral fees.  There was also friction between them because Townsend had begun dating Tonya French, Clay's longtime girlfriend, who was the mother of two of his children.

Not long after Clay resigned from Made Men, his 19–year–old son, Willie Clay III (Willie), [FN 2] was shot dead on the streets of Oakland, and Clay believed Townsend was responsible.  Sometime later Townsend, in fact, admitted to Jones he had killed Willie.  After Willie's death, Clay came to believe Townsend also planned to kill him or have him killed.

A week or two before Townsend's death, Townsend told Jones he was coming to her house to kill Clay.  Jones also said the word of mouth in the community was that Townsend had "put some money over on [Clay's] head and had somebody to do the hit." [FN 3] As we shall describe, several other witnesses presented by the defense also

testified they had heard Townsend threaten to kill Clay or try to put a hit on him.

4. Clay's Statement to the Police

After his arrest, Clay was interviewed by Antioch police detective Diane Freier at the police station. He initially denied being involved in any shooting. Later, he asked to talk again to Freier and admitted killing Townsend. "I killed that motherfucker 'cause he killed my son" " 'cause I wanted to get out the bike club," and "then he was telling people he was gonna kill me." He described seeing Townsend riding his motorcycle on the street before he parked it in the 7–Eleven parking lot. Clay believed Townsend was going to kill him because "he had got word that I knew he had killed my son." As Clay stepped out from behind the 7–Eleven he believed Townsend looked briefly over in his direction. As Clay shot, Townsend got off his motorcycle, stumbled and fell on his face. Clay then ran up and shot him in the back of the neck. Clay was very distraught when he confessed to Freier. In explaining the killing, he emphasized his fear of Townsend and said he was "more afraid than anything." At one point, however, Clay told Freier "to be honest," he killed Townsend "to seek the revenge" for Willie's murder.

5. The Videos

As noted, several videos retrieved from Jones's house were played for the jury over defense objection at the end of the prosecution's case in chief. The videos were recorded about five weeks before Townsend was killed. One of them, Video No. 36, showed Clay exercising while speaking to another man, who remained unseen on the video. Clay essentially carried on a profanity-laced monologue, saying in part: "Oh yeah, we got air—the air is ho—hot out here man, You know what I'm saying'? But for all the suckas, you know what I'm saying. Yeah. We keep our water pistols, man. Yeah ... at all times." As he said "water pistols," he pulled a black semi-automatic handgun out from under his white tank top and held it up. He continued to display the gun as he said, "You know, I'm sittin' in the sun. You know I'm sayin', when it's burning up outside, man. You know we might need to cool a mother fucker off, man. Yeah, that's for the suckas that thought they had it fucked up, nigga. Yeah. Fuck you and the horse you rode in on, nigga ... yeah. Yeah. So guess what? ... I gun your ass down and knock your ass out." Thus, Clay was shown brandishing a handgun, which he was forbidden by law to possess, and boasting about his intention to commit a violent act.

Video No. 44, also admitted over defense objection, showed Clay talking to the camera in the company of a second man who was scaling a fish. Clay began by announcing they were in Oakland, "where we do what we do." In the background, parked on the street behind Clay, was a dark BMW with distinctive rims, which matched the rims of the car he was driving when he killed Townsend. In the video, Clay called himself "Strategos X." Video No. 44 was not nearly as inflammatory as Video No. 36.

. . .

4

### 1. Evidence of Townsend's Violent Character

Clay, represented by J. Tony Serra, presented a robust though ultimately unsuccessful defense. Numerous witnesses, including law enforcement authorities, testified for the defense that Townsend was a violent man who usually was armed with one or more handguns. Daniel Vasquez, a 30–year career officer with the Department of Corrections who had been a prison warden, was qualified as an expert in the areas of street gangs, prison gangs and specifically the Black Guerilla Family (BGF). He testified Townsend was a validated member of BGF. Vasquez identified BGF as a violent gang both in the community and in prison that had been in operation since the mid–1960's. The gang sold drugs and carried out homicides and hits. Townsend himself had been a target of a federal task force in Alameda County. He was reputed to be exceedingly dangerous and an active seller and user of drugs.

Russell Giuntini, a longtime prosecutor in Alameda and San Francisco counties, had prosecuted the BGF for years. Giuntini was a member of a joint federal and state task force in the mid–1990's in which Townsend had been the number one target because he had "the greatest reputation for violence" of all the people they investigated and was "violent to legendary proportions." He was also adept at avoiding detection, so Giuntini was able to prosecute him only for a small amount of heroin, and he received a four-year prison sentence in 1997.

Warren King, who was serving a state prison sentence for second degree murder, had known Townsend since King was 12 or 13 years old. King called Townsend "vicious," an "extreme killer," who was "really ruthless," like "a rabid dog," and one of the "most notorious killers" to come out of the East Bay. When King was about 19, Townsend shot him in the leg when Townsend and six or seven others attacked him in a dispute over drug profits. At the time Townsend was carrying two different handguns. King described other shootings committed by Townsend and testified Townsend had worked as an "enforcer" for Felix Mitchell, a notorious Oakland drug lord. Townsend was the "muscle" for Mitchell, meaning he used a gun to do Mitchell's "dirty work." King steered away from Townsend after learning he had no compunction about shooting a child.

Other witnesses confirmed that Townsend had a reputation as a killer and hitman and testified to his specific past acts of violence. For instance, in the early 1990's, Townsend shot and killed a man in an Oakland nightclub whom he recognized as an off-duty police officer. Coworkers at Bayside, Rick and Victoria Atkinson, husband and wife, testified to Townsend's acts of cruelty and violence, including freezer-burning a hole in Victoria's skin, forcing her car off the road with his truck, and pointing a gun at Rick's head in 2006. Townsend regularly carried a gun and frequently bragged about his violent exploits.

### 2. Townsend's Threats Against Clay

Defense witnesses also confirmed that Townsend had threatened Clay's life on several occasions. After Willie's funeral, Clay told his

sister, Maria Clay, that Townsend and his people were going to kill him and might kill her and her kids. Maria moved to Merced because she was scared. In 2007, Victoria Atkinson heard Townsend threaten to kill Clay, saying "it's lights out" for Clay. In 2007 or 2008, Townsend called King and offered him money to "knock somebody down." The "somebody" was Clay, and by "knocking somebody down" Townsend meant he wanted King to kill Clay. King did not carry through with the hit and instead told Clay about the proposition. Clay was stunned.

In 2009, Clay received a text, inferably from Townsend, which read, "Nigga, stop playing with me. When I see you, it's on." Clay's cousin, Myisha Pina Luboviski, had run into Townsend on the street a couple of months before Townsend's death, and Townsend said of Clay, "That nigga ain't cool. When I see him, it's a problem." Luboviski interpreted that to mean Townsend would kill Clay if he saw him again, and she conveyed the threat to Clay's family. Then, just two or three days before Townsend was killed, Townsend offered Rick Atkinson a couple thousand dollars to kill Clay or to tell Townsend where Clay could be found. Rick turned down the money and told Clay about Townsend's offer.

3. Tonya French

Tonya French and Clay had been together as a couple off and on for 15 or 20 years and had two children together. She described the cooling of his relationship with Townsend in 2005 or 2006 when Clay left the Made Men. Clay was devastated by his son's murder; his own demeanor changed dramatically in that he became much more withdrawn. After Willie was killed, Townsend told French, "[Clay] know[s] what I [will] do to him," which French interpreted as a death threat, and Townsend repeated similar words on another occasion a couple of months before his own death. When she told Clay about Townsend's remarks, he looked "spooked."

French testified on cross-examination that after Willie was killed, she went out on a few dates with Townsend. She admitted Clay sent her a text three weeks before Townsend was killed, after she had gone out with Townsend, saying, among other things, "You stupid if you think me and you is going to have a decent conversation about you all being disrespectful to me, bitch. Someone is going to die first!!!!!" French denied the text message was a threat against Townsend. Rather, she said Townsend had threatened Clay, and Clay was frightened. French admitted she called 911 on one occasion in 2008 during a dispute with Clay.

4. Clay's Trial Testimony

Clay, who was 46 years old at the time of trial, met Townsend when he was about 18; Townsend was four years older. Except for Townsend, Clay testified he had never killed anyone. He was never a member of a prison gang or street gang and never participated in Townsend's crimes. Clay had worked as a barber since age 16 and had his own barber shop from 1992 to 1997. In 2005 and 2006 he worked as a loan officer for Barbosa at Platinum Real Estate Company and Kuspard at Bayside. He also sold cocaine from the age

of 19 and had a felony conviction in 1999 for using a telecommunication device to facilitate drug trafficking. Since 1986 it had been illegal for him to possess a gun due to a felony conviction. He bought the gun he used to kill Townsend on the street in Oakland.

In 2005, Clay and Townsend formed Made Men. Clay denied the club was involved in criminal activity. There were 15 to 20 members and they rode to a lot of bike events. At the end of 2005, Clay quit the club because he did not like the direction in which it was going. Townsend collected dues from members and Clay thought he should be more "transparent" about how the money was spent. He and Townsend had a heated argument; Clay turned in his Made Men patch and left.

Within hours after Willie's murder, Clay was told a friend of Townsend's had killed Willie, mistaking him for Clay. Clay also heard from someone else that Townsend's killing of Willie was intentional due to the falling out between Clay and Townsend over Made Men. Townsend attended Willie's wake in late January 2006. At the wake, Clay and Townsend had a confrontation and Clay almost slugged Townsend, but he got onto his motorcycle and rode off instead. Clay testified that, at Willie's wake and thereafter, Townsend threatened him several times. Clay believed Townsend was out to kill him. Townsend was bigger than Clay, and Clay knew Townsend was a killer.

After the threats began, Clay took steps to avoid contact with Townsend. He would drive cars Townsend did not know about. He changed residences and warned his sister and her children to leave the area because he felt their lives were in danger. He had sleepless nights and was plagued by recurrent dreams that he and Townsend were having a gun battle and Clay's gun would not fire.

Clay knew Townsend was a member of BGF and knew it was a violent gang. Townsend once told him he had "earned" one of his gang tattoos by stabbing someone in prison on behalf of BGF. Townsend told Clay he had been a hitman for Felix Mitchell and had killed at least one man on Mitchell's behalf. Clay testified about several instances in which Townsend had admitted killing people, including the off-duty police officer about whom his sister had testified. In 1986, Townsend shot a man twice in the head at a car wash and paralyzed him for life. Townsend also told Clay he had tried to kill a drug dealer but accidentally killed another woman instead, and someone else was serving time for the murder. In 1995 or 1996, Townsend bragged to Clay he had committed 30 murders by the age of 28.

Townsend pulled a 12–gauge shotgun on Clay in 2005 when Clay refused to give him a motorcycle that had been left with Clay for safekeeping. In 2006, Clay also saw him point a gun at Rick Atkinson's head. Townsend was always armed with at least one handgun and regularly wore a bullet-proof vest. By April 27, 2009, Clay believed he was going to be killed. He also knew Townsend was capable of having someone else kill him. He had heard from several people, including his sister, his cousin, and King, that his life was in danger, and he knew Townsend had offered Rick Atkinson money to

have him killed only three or four days earlier.  He felt he was in danger and was in a state of fear.

Clay testified he was out all night the night before the shooting, as it was Jones's birthday.  He slept at Jones's house until 3:30 or 4:00 p.m. on April 27, 2009, watched some television, and then drove off to meet an associate around 5:15 p.m. to talk about some videos they were making.  On his way back to Jones's house, he saw Townsend on his motorcycle pulling into the 7–Eleven parking lot and immediately became nervous because Townsend was in his and Jones's neighborhood, where Clay had never seen him before.  Clay was so nervous he began shaking.  When he first saw Townsend, he had no intention of killing him.  He parked his car and left the engine running because he intended only to look over the hedge to see if Townsend was meeting someone else in the parking lot.  He hid by the 7–Eleven just to find out what Townsend was doing in his neighborhood.  Clay admitted he was watching and waiting for Townsend and was trying to keep Townsend from seeing him.  When he heard Townsend's Harley start up, he thought, "if he see[s] me, he's going to kill me."  By then, he admitted he intended to kill Townsend.  He knew Townsend was a successful hitman, and he felt trapped.  Calling law enforcement was not an option, he said, and would only have escalated Townsend's attempts to kill him.  I thought "he was going to look my way, and I just panicked... I just ran out there and I just shot him."

On cross-examination, the prosecutor elicited from Clay that a friend with whom he co–founded a group called "All Family No Friends" or "Alliance For a New Future" (AFNF), was someone he met in San Quentin who also was involved in Kumi African Nation (Kumi), which Clay identified as a prison gang offshoot of BGF.  Even so, Clay denied AFNF was an offshoot of Kumi and denied it was a criminal enterprise.  He claimed AFNF was a group devoted to creating unity and promoting education, and which he hoped to turn into a nonprofit corporation.  Members were required to study sign language, Swahili, Spanish and Arabic; they were required to read the Bible, the Qur'an and the English dictionary three times each.  He spoke out against violence in AFNF's bylaws and wanted to recruit all ages and "different nationalities" into AFNF.  The bylaws, which he wrote, proclaimed that AFNF was "NOT A GANG."

Clay further testified on cross-examination, even though Townsend cheated him out of $11,000 in 2005 in connection with their dealings at Bayside, the shooting had nothing to do with that, and it was not committed in revenge for Townsend's involvement in killing Willie.

5. Psychologist's Testimony that Clay Suffered from PTSD

Dr. Marlin Griffith, a licensed psychologist since 1975, was qualified by the court as an expert in forensic psychological evaluations.  Dr. Griffith opined that Clay suffered from posttraumatic stress disorder (PTSD) which was in remission.  The stress was Willie's murder and the later bullying behavior by Townsend.  Clay had recurrent and intrusive distressing thoughts and memories of the events.  The trauma arose from the repeated warnings he would be killed— knowing about Townsend's prior murders and violent acts—the

"whole conglomeration [of] fear that he had."

C. District Attorney's Rebuttal Case

The prosecution called four rebuttal witnesses: A sheriff's aide at the Contra Costa County detention facility testified that she accepted an incoming FedEx package for Clay in May 2011 at a time when Clay was acting in pro per. The package was marked "legal mail" but it was determined not to be legitimate legal mail and was in violation of the jail's pro per policy. The package contained copies of bylaws for AFNF, which Clay had written in jail. Clay had solicited one of his girlfriends to make copies of the bylaws and to mail them back to him so he could distribute them in jail to recruit new members. He sent out the request as "legal mail," but it did not qualify as such. Clay testified his pro per status was not revoked as a consequence, but he never received the package. The prosecutor attempted to portray AFNF to the jury as an offshoot of Kumi. Her ostensible point in introducing the evidence was to show Clay had broken jail rules, thus casting doubt on his credibility by demonstrating his willingness to engage in falsehood.

Two Contra Costa County sheriff's deputies at the detention facility where Clay was housed testified about a fight nearly two years before trial between black inmates and members of the Sureños, a violent Hispanic gang, with 35 to 40 inmates involved. The deputies did not see Clay fighting, but when one of them interviewed Clay after the fight, he saw what appeared to be bloodstains on Clay's shoes and pants and an abrasion on the knuckle of his right ring finger.

The final witness at trial was Jessica Ferranti, M.D., a psychiatrist at U.C. Davis, who was qualified as an expert in psychiatry. She examined Clay once in October 2011. She did not see any history of mental health services provided by the jail to Clay and did not see the major criteria for PTSD. She disagreed with Dr. Griffith's diagnosis; she believed Clay was not suffering from any major mental disorder at the time of the offense. Her diagnosis for him was antisocial personality disorder.

*Clay*, 2018 WL 1735787, at *1–7.

### III.    DISCUSSION

#### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the

basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "had substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795 (2001).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

United States District Court
Northern District of California

state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991);[3] *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).  With respect to Petitioner's claims for habeas relief, some claims were raised on direct review and denied in a reasoned decision, and then later denied summarily by the California Supreme Court.  Other claims were raised for the first time in his state habeas petition and summarily denied.  In reviewing each claim, the Court examines the last reasoned state court decision that addressed the claim.

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)).  Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA.  *Id.* at 102.

### B.    Petitioner's Claims

Petitioner raises the following nine claims for relief:  (1) Petitioner's constitutional rights were violated by the trial court's refusal to give a self-defense instruction; (2) the admission of videos seized following Petitioner's arrest violated his right to a fair trial; (3) Petitioner's right to a fair trial was violated by the admission of improper and prejudicial rebuttal evidence; (4) trial counsel's failure to object to the prosecutor's appeals to the passions and fears of the jury deprived Petitioner of his constitutional right to a fair trial; (5) the prosecutor's statements during *voir dire* deprived Petitioner of his right to a fair trial; (6) the cumulative effect of the errors so infected the

---

[3] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).  The look through rule continues as the Ninth Circuit held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear."  *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

United States District Court
Northern District of California

1   trial with unfairness as to make Petitioner's conviction a denial of due process; (7) Petitioner's

2   constitutional rights were violated by the trial court's denial of his *Miranda* motion; (8)

3   Petitioner's constitutional rights were violated when the prosecution failed to present a gang

4   expert to establish that Petitioner was a gang member; and (9) Petitioner's constitutional rights

5   were violated by the trial court's refusal to permit the defense to submit Federal Bureau of

6   Investigation documents as support for their case in chief.  Dkt. No. 10.

### 1.      Claim No. 1: Jury Instruction

8        Petitioner argues that the trial court erred in failing to provide the jury with a perfect or

9   reasonable self-defense instruction, specifically CALJIC No. 5.12.[4]  Dkt. No. 10 at 21.  Petitioner

10  raised this claim on appeal.  The California Court of Appeal rejected this claim as follows:

> Reasonable self-defense is a complete justification for homicide and, if believed, results in acquittal.  (*People v. Elmore* (2014) 59 Cal.4th 121, 133–134; § 197, subd. 3; CALJIC Nos. 5.12, 5.14, 5.30.)  But that rule applies only when the defendant's belief in the need for self-defense is both subjectively held and objectively reasonable. (*Elmore*, at pp. 133–134; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*); *People v. Jefferson* (2004) 119 Cal.App.4th 508, 518; CALJIC Nos. 5.12, 5.32, 5.51.)   When a homicide is committed while acting under an honestly held but objectively unreasonable belief in the need for self-defense—sometimes called "imperfect self-defense"—the crime is voluntary manslaughter. (*Elmore*, at p. 134; *Humphrey*, at p. 1082; CALJIC Nos. 5.17, 8.41.) The court here instructed the jury on imperfect self-defense, but refused to instruct on perfect self-defense.

---

[4] The instruction reads:

> The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes: [¶] 1. That there is imminent danger that the other person will either kill [him] [her] or cause [him] [her] great bodily injury; and [¶] 2. That it is necessary under the circumstances for [him] [her] to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to [himself] [herself]. [¶] A bare fear of death or great bodily injury is not sufficient to justify a homicide.  To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone.  The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm.

United States District Court
Northern District of California

For self-defense to apply, the defendant must actually and reasonably believe the threat of physical harm is "imminent"; indeed, "[i]mminence is a critical component" of a theory of self-defense. (*Humphrey*, *supra*, 13 Cal.4th at p. 1094; see also, *People v. Hardin* (2000) 85 Cal.App.4th 625, 629 (Hardin ); *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270 [classic lying-in-wait situation did not warrant self-defense instruction]; *People v. De Leon* (1992) 10 Cal.App.4th 815, 824–825 [no substantial evidence of either perfect or imperfect self-defense]; CALJIC No. 5.13.) Accordingly, the first aggressor is not entitled to claim self-defense unless he has first endeavored to " 'really and in good faith withdraw from the combat,' " and has also by words or conduct " 'ma[d]e known his intentions to his adversary.' " (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 588–589; *see* CALJIC No. 5.54.) And while prior threats by the victim justify a quicker and harsher response by the defendant (*People v. Pena* (1984) 151 Cal.App.3d 462, 474–477; CALJIC No. 5.50.1), prior threats alone, in the absence of an imminent assault, do not support a claim of self-defense (*People v. Minifie* (1996) 13 Cal.4th 1055, 1068).

. . .

The evidence in this case presented a textbook example of when a claim of self-defense is not available. Clay, having seen Townsend and his motorcycle enter the parking lot at 7–Eleven, hid and waited for Townsend to return for his motorcycle. Clay then sneaked up on Townsend from behind, shot him in his back, fired off more shots as he approached closer, continued shooting after Townsend fell off his motorcycle, and delivered the final shots directly into the back of Townsend's neck. This was an ambush, not self-defense. Though Clay's passions may be understandable, the law does not countenance the kind of preemptive strike involved here.

Even if we assume Clay was entitled to self-defense instructions, their omission was harmless. We apply the *Watson* test of prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (Watson ). . . . Under that test we ask whether it is reasonably probable an outcome more favorable to the defendant would have been obtained, had the instruction been given. (*Watson*, at p. 836.)

The jury was instructed on a broad range of options in fixing the degree of Clay's culpability. The judge instructed on first degree murder by lying in wait, premeditated and deliberated first degree murder, second degree murder, mental disease or defect as negating specific intent, voluntary manslaughter by imperfect self-defense, and heat of passion voluntary manslaughter. The jury found Clay guilty of special-circumstance lying-in-wait first degree murder. That verdict was well-supported by the evidence from his own mouth that he saw Townsend pull into the 7–Eleven parking lot, not just that he saw his motorcycle parked there. Townsend attended Barbosa's ultrasound appointment for 15 minutes before returning to his motorcycle. Thus, Clay waited a substantial time in hiding before he actually stepped out to kill Townsend.

The jury rejected claims that Clay acted in imperfect self-defense or

1
2
3
4

> in the heat of passion or that PTSD prevented him from forming the specific intent to kill.   Having rejected these more plausible explanations of the crime, it is inconceivable the jury would have acquitted Clay based on reasonable self-defense.  Indeed, the jury's true finding on the lying-in-wait special circumstance effectively precluded a self-defense theory.   Any instructional omission was harmless under any standard.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *Watson*, *supra*, 46 Cal.2d at p. 836.)

5   *Clay*, 2018 WL 1735787, at \*8–9.

6          The state court's rejection of this claim was neither an unreasonable application of

7   Supreme Court precedent nor an unreasonable determination of the facts.  As an initial matter, a

8   challenge to a jury instruction solely as an error under state law is not proper for federal habeas

9   review.  *See Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991).  To obtain federal relief for errors in

10   the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire

11   trial that the resulting conviction violates due process.  *See id*.

12          Due process requires that "'criminal defendants be afforded a meaningful opportunity to

13   present a complete defense.'"  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting

14   *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Therefore, a criminal defendant is entitled to

15   adequate instructions on the defense theory of the case.  *See Conde v. Henry*, 198 F.3d 734, 739

16   (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such

17   instruction was supported by the evidence).  Nevertheless, due process does not require that an

18   instruction be given if the evidence does not support it.  *See Hopper v. Evans*, 456 U.S. 605, 611

19   (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("a state trial court's finding

20   that the evidence does not support a claim of imperfect self-defense is entitled to a presumption of

21   correctness on federal habeas review.") (citation omitted).  Whether a constitutional violation has

22   occurred will depend upon the evidence in the case and the overall instructions given to the jury.

23   *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).  An examination of the record is

24   required to assess precisely what was given and what was refused and whether the given

25   instructions adequately embodied the defendant's theory.  *See United States v. Tsinnijinnie*, 601

26   F.2d 1035, 1040 (9th Cir. 1979).

27          Based on this Court's examination of the record, it finds that the trial court appropriately

28   declined to instruct on perfect self-defense.  As noted by the state court, self-defense under

*United States District Court*
*Northern District of California*

14

California law requires that a defendant's belief in the need for self-defense be subjectively held and objectively reasonable. *Clay*, 2018 WL 1735787, at *8. In addition, the defendant must actually and reasonably believe the threat of harm is imminent. *Id*. The record fails to support either of those conclusions. Various witnesses testified that Petitioner shot the victim from the back, at close range, repeatedly, even after the victim had fallen off his motorcycle and was on the ground. Dkt. No. 22-16 at 70–76, 104–08. The witnesses testified that Petitioner appeared calm and that he and Townsend did not exchange words prior to the shooting. *Id*. On direct-examination, Petitioner himself testified that after observing Townsend pull into the 7-eleven, Petitioner parked nearby and proceeded to sit and wait for the victim to appear: "[s]o I'm still looking. I'm still waiting. I don't see anything. So I'm just sitting there. I'm just waiting to see you know if somebody is going to come." Dkt. No. 22-25 at 141–45. The record simply did not support a perfect self-defense instruction.

Petitioner references a number of facts suggesting Townsend's propensity for violence and Petitioner's fear for his safety. Dkt. No. 10 at 22–24. But these facts do not change the result here: Petitioner's general fear directly preceding the shooting fails to support the conclusion that at the moment he shot Townsend, he feared he was in *imminent* danger. Because the self-defense instruction was not warranted, the state court's decision rejecting this claim does not amount to an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts. Claim No. 1 is denied.

**2.   Claim Nos. 2 and 3: Admission of Evidence**

In Claim No. 2, Petitioner avers that the admitted videos recorded by Petitioner were irrelevant, highly prejudicial, and violated his right to a fair trial. Dkt. No. 10 at 26. In Claim No. 3, Petitioner argues that the admission of evidence relating to two incidents while he was held in jail — a gang fight and an issue concerning Petitioner's mail — violated his right to a fair trial. *Id*. at 36. The California Court of Appeal laid out the relevant background and rejected Claim 2 as follows:

> The prosecutor moved in limine to introduce six videos found on Clay's flip camcorder. Clay's counsel opposed the motion on the ground that not all originally existing videos were available and that

United States District Court
Northern District of California

the existing videos were more prejudicial than probative.  The court admitted five of the videos in whole or in part pursuant to Evidence Code section 1103, subdivision (b), and excluded one of the videos entirely.  Video Nos. 36 and 44 (numbered based on the camera annotation) were deemed admissible, and Clay claims on appeal these two videos (Exhibits 104 and 105) were erroneously admitted because they were irrelevant and more prejudicial than probative, so much so that their admission deprived him of a fair trial and amounted to a federal due process violation.

. . .

Relevance is a low threshold: "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Video No. 36 had significant probative value for the prosecution because it showed Clay threatening to "gun your ass down and knock your ass out" a few weeks before he shot and killed Townsend and showed him illegally in possession of a handgun.  Although Townsend's name is not mentioned in the video, a juror could reasonably infer (or not infer) the threat was directed at Townsend.  There was plenty of evidence to establish Townsend and Clay had a running feud.  If the jury inferred Clay was threatening Townsend in the video, it unquestionably had a tendency in reason to influence the fundamental question whether Clay acted instinctively in a state of fear, as he testified, when he gunned down Townsend.  That he boasted about wanting to gun someone down just weeks before the actual events was also relevant to the jury's assessment of Clay's credibility in giving his version of the events and his claim of being a peaceable person.

But even if the only legitimate inference to be drawn from the video was that Clay had violent tendencies, this was fair game after Clay's attorney elicited damaging information about Townsend's violent character from Jones prior to the introduction of the videos. . . .

Likewise, Video No. 44 was deemed relevant because it showed Clay in the same frame with the dark BMW ultimately connected to Townsend's death, thereby strengthening the prosecution's case that he had access to the car that a witness saw leaving the scene of Townsend's murder.  The BMW in the video had distinctive rims exactly like the ones on the car Clay drove after he killed Townsend.  The People claimed Video No. 44 was also relevant because it showed Clay dressed in a white hard hat and orange vest similar to articles of clothing found in the dark BMW parked at Jones's house when it was searched after the shooting.  The court found Video No. 44 relevant to identity and relevant to credibility because Clay identified himself in it as "Strategos X"—which corresponded to the name on documents sent into jail improperly using the "legal mail" designation, admitted to show Clay had abused his pro per privileges.  The violation of jail mail rules was relevant to show willingness to engage in falsehood.

Clay's attorney conceded in his opening statement that Clay killed Townsend, which Clay contends rendered both videos irrelevant to identity. . . .

Even assuming defense counsel could render evidence of identity irrelevant by conceding Clay's identity as the killer in his opening statement, neither video was relevant solely to identity. The crucial point with respect to Video No. 36 is that counsel never conceded Clay's culpable mental state. [FN 6] Video No. 36 was clearly relevant to mens rea and therefore was admissible even in light of Clay's attorney's concession and Clay's ultimate admission. *(See People v. Sattiewhite* (2014) 59 Cal.4th 446, 471 [gruesome "crime scene photographs were relevant to establish the killer's mental state, an issue that defense counsel did not concede"].) Counsel argued in closing that Clay was guilty at most of voluntary manslaughter based on his honest but unreasonable belief in the need for self-defense, heat of passion, and lack of specific intent in light of his PTSD. The video showed Clay's violent intentions weeks before he killed Townsend, as well as his violent propensities, tough talk, and illegal possession of a handgun, all of which had a potential bearing on the jurors' assessment of his mental state at the time he killed Townsend. Nor did counsel concede Clay had waited and watched for Townsend so as to be convicted of first degree murder for lying in wait. (§ 189.) Instead, counsel argued that Clay had killed in "a panic reaction, an action ultimately to save his own life" because he "felt he was in danger of being killed at any moment." Defense counsel insisted Clay "did not have the requisite state of mind for a murderer." The prosecutor was allowed to introduce Video No. 36 to attempt to negate these suggestions.

Video No. 44 was relevant not only to identity, but also to Clay's link to AFNF, as he called himself "Strategos X" in the video, and Strategos X was listed as the "Co–Chief Commander" of AFNF in the materials illegally sent into the jail. Thus, Video No. 44 was also relevant because it linked Clay to the illegal jail mail, which, in turn, called into question his credibility. [FN] Hence, both videos were relevant and admissible on issues other than character and other than identity.

. . .

Clay contends the evidence had an overpowering prejudicial impact. Clay's concern centers on the videos' creation of the impression that he is a tough-talking gangster willing to use a gun to settle a score. He testified he made Video No. 36 as a form of street theater or "street news," hoping to attract an audience online. He was play-acting and did not intend his tough talk as a real threat to anyone. Whether the videos should have been taken seriously was for the jury to decide; Clay's explanation went to the weight of the evidence, not its admissibility. *(See People v. Ochoa* (2001) 26 Cal.4th 398, 438 (*Ochoa* ).)

This case is unlike *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, cited by Clay, a pre-AEDPA case in which a prosecutor inserted into the trial damaging and irrelevant evidence about the defendant's knife collection and portrayed him as a commando-style knife aficionado,

United States District Court
Northern District of California

where the testimony's only connection to the crime was that the victim's throat had been slit and the murder knife had not been found. (*Id.* at pp. 1381–1382.)  The Ninth Circuit found most of the evidence was relevant only to character, and therefore reversed the defendant's conviction.  (*Id.* at p. 1386.)  Moreover, in *McKinney*, there was no suggestion that McKinney had first introduced evidence of the victim's bad character, as Clay did here.

Video No. 36 was highly probative on the issues of premeditation, deliberation, and imperfect self-defense, all of which were before the jury.  The video seriously undercut Clay's theory of defense that his killing of Townsend was the product of sudden fear upon seeing Townsend by the 7–Eleven in his neighborhood.  It gave the jury a unique perspective on Clay's unvarnished thoughts about waging violence against his enemies a few weeks before he killed Townsend. The court did not abuse its discretion in admitting the video.

Video No. 44 had far less prejudicial potential than Video No. 36, and its probative value was correspondingly less compelling.  It did not involve talk of violence or display of a gun.  But its prejudicial impact was even more attenuated than its probative value.   The court legitimately deemed the video not substantially more prejudicial than probative.  (Evid. Code, § 352.)  And even if it was improperly admitted, its capacity for prejudice was so slim in light of all the evidence that we would find its admission harmless under any standard.  (*Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)

*Clay*, 2018 WL 1735787, at *10–13.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated, or "if it appears that its admission violated fundamental due process and the right to a fair trial." *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).  Importantly, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)).  The due process inquiry on federal habeas review is a general principle of "fundamental fairness," i.e., whether the admission of evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice'". *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)).  This is true, however, "[o]nly if there are no

permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). A showing of constitutional error under the Sixth Amendment only merits habeas relief if the error was not harmless, that is, if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Holley*, 568 F.3d at 1100 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

As noted by the California Court of Appeal, there were various permissible inferences to be drawn from the videos. Petitioner's state of mind while shooting Townsend was a key issue in the case, as were character and overall credibility. The videos were taken one month before the shooting, and while they do not mention Townsend, they show Petitioner with a firearm talking about "gun[ning] yo' ass down and knock[ing] yo' ass out." Dkt. No. 22-9 at 66; Dkt. No. 31. This evidence was relevant to Petitioner's *mens rea* during the shooting, and the jury could have drawn the inference that the shooting was premeditated. The jury also could have inferred that Petitioner had a violent disposition, despite his testimony to the contrary. Because the inferences were permissible, the state appellate court did not unreasonably apply Supreme Court precedent in holding that the admission of the videos did not violate due process. *See Jammal*, 926 F.2d at 920.

Even assuming, however, that the trial court's ruling on this issue was erroneous, the error could not have had a "substantial and injurious effect or influence in determining the jury's verdict" on the facts of this case. *Brecht*, 507 U.S. at 623. As the state appellate court noted, the evidence weighing against Petitioner was so significant that any alleged prejudice from the videos was minimal. Petitioner is denied habeas relief on Claim No. 2.

With respect to Claim No. 3, Petitioner contends that the admission of evidence relating to a gang fight and Petitioner's "legal mail" rendered the trial unfair because the incidents were irrelevant and highly prejudicial. Dkt. No. 10 at 36. The California Court of Appeal rejected this claim as follows:

> [T]he prosecution attempted to rebut Clay's defense by presenting evidence of (1) his having broken the jail's rules regarding legal mail; (2) having engaged in a violent confrontation with a group of Sureños in jail; and (3) a psychiatrist's opinion that Clay suffers from antisocial personality disorder, not PTSD. Clay claims the first two categories of evidence were improperly admitted as rebuttal evidence, and admission of that testimony denied Clay his federal and state

United States District Court
Northern District of California

constitutional due process right to a fair trial, and were more prejudicial than probative. (Evid. Code, § 352.) The defense moved at trial to exclude the rebuttal evidence.

A trial court's ruling on the admissibility of rebuttal evidence is reviewed for abuse of discretion. (*People v. Raley* (1992) 2 Cal.4th 870, 912.) "Prosecution rebuttal evidence must tend to disprove a fact of consequence on which the defendant has introduced evidence." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1088.) "It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." (*People v. Mayfield* (1997) 14 Cal.4th 668, 761.) When the defendant himself has testified, as here, evidence related to his credibility may be presented in rebuttal. (Evid. Code, §§ 785, 786.)

These guidelines were satisfied in this case. Clay's counsel had introduced extensive evidence about Townsend's violent character, which opened the door to rebuttal evidence about Clay's violent tendencies, including by evidence of specific acts of violence. (Evid. Code, § 1103, subd. (b).) The evidence about the fight in the jail fell into that category and was not improper rebuttal.

In addition, when a defendant presents testimony of his good character at trial, the door is then open for the prosecution to impeach or rebut such evidence with bad character evidence. (Evid. Code, § 1102.) Prior to the introduction of the prosecution's rebuttal evidence, Clay denied being a part of any gang and claimed the creation of his group, AFNF, was his way of creating unity and promoting education. Clay claimed he advocated against violence. The trial court permitted the evidence of the illegal attempt to bring AFNF documents into jail to impeach his credibility because it showed his willingness to engage in falsehood. Although the court did not rely on this point, it was also relevant to Clay's gang membership, as the prosecutor urged the jury to draw the inference that AFNF was a gang.

Clay's counsel objected to evidence of his violation of jail mail rules, but the prosecutor contended it was relevant to Clay's truthfulness. We conclude the evidence was properly admitted in rebuttal. "[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony." (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946.) "Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it has a tendency in reason to disprove the truthfulness of the witness's testimony." (*People v. Hawthorne* (2009) 46 Cal.4th 67, 99; accord, *People v. Humiston* (1993) 20 Cal.App.4th 460, 479–480; Evid. Code, §§ 780, 785.)

This ruling was not an abuse of discretion. And even if we were to assume for purposes of argument the rebuttal evidence was improper, we would find its admission harmless. Evidentiary error is subject to the *Watson* standard of prejudice (*Watson, supra,* 46 Cal.2d at p. 836) unless it made the trial "fundamentally unfair." (*People v. Partida*

(2005) 37 Cal.4th 428, 436.)  In a case where Clay was charged with first degree murder by lying in wait and discharging a firearm, evidence about his possible brief participation in a mass disturbance in jail and mislabeled jail mail fails to show fundamental unfairness, and Clay's claimed error was harmless under the state law standard. (*Watson*, at p. 436.)  The rebuttal evidence was weak at best and is unlikely to have moved any reasonable juror to vote for a verdict reflecting greater culpability than he or she would have voted for in the absence of that evidence.

*Clay*, 2018 WL 1735787, at *13–14.

To the extent Petitioner is arguing that the trial court erred in its evidentiary ruling, this argument is not proper for federal habeas review.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (establishing that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.)  As noted *supra*, to rise to the level of a constitutional violation, the admission of evidence must violate fundamental concepts of justice, and there must be no permissible inference to be drawn from the admitted evidence.  *See Dowling*, 493 U.S. at 352; *see also Jammal*, 926 F.2d at 920.

As the state appellate court explained, the thrust of Petitioner's defense was to portray himself as peaceable and fearful of Townsend's capacity for violence.  The two jail incidents were used to negate that defense.  Regarding the gang fight, Deputy Sandy testified that following the incident, he went to the cells to interview inmates. Dkt. No. 22-26 at 145.  He testified that upon reaching Petitioner's cell, he observed white shoes and a pair of pants with bloodstains, as well as an abrasion on Petitioner's knuckle.  *Id*. at 145–46.  While the evidence was slight, the jury could have drawn the inference that Petitioner's possible participation in the gang fight could reflect a capacity for violence, and that this capacity may have played a role in his shooting of Townsend. With respect to the mail incident, Denise Cuews testified that a package marked "legal mail" for Petitioner was not legal mail and violated the prison's pro per policy.  *Id*. at 120, 130.  While weak, evidence regarding this incident may have had a bearing on Petitioner's credibility, which in turn may have influenced the jury's perception of Petitioner's trustworthiness.  Thus, various permissible inferences could have been drawn from the admitted evidence.  *See Jammal*, 926 F.2d at 920.

More significantly, to the extent the trial court erred in admitting this evidence, that error

was certainly harmless. *See Brecht*, 507 U.S. at 637. As the state appellate court appropriately noted, in a case involving a charge of first-degree murder, with numerous eyewitnesses, evidence regarding a brief gang fight and mislabeled mail was unlikely to influence a reasonable juror. The Court denies habeas relief on Claim No. 3.

### 3. Claim No. 4: Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective in failing to object to parts of the prosecutor's closing argument that improperly appealed to the emotions of the jury. Dkt. No. 10 at 42–44. *Id.* The California Court of Appeal laid out the relevant statements and analyzed the claim as follows:

> [T]oward the end of her closing argument, the prosecutor, referring to the homicide, said to the jury: "This is exactly the kind of violence that is plaguing so many areas of our county right now. It's a culture killing, his business. Violence is the commodity of exchange." Shortly afterward the prosecutor continued: "This is one OG [old gangster] killing another OG over a personal beef . . . That's what this case is, plain and simple. It's not a crazy killing done by someone with mental health problems. It's not. It's exactly the sort of gang style killing that is plaguing all the areas of our county and nearby counties in the Bay Area, Oakland, Richmond, Antioch." Finally, close to the end of her argument, the prosecutor said: "And the minute we start endorsing this kind of violence, you can see kinda what happens. It's like the violence begets violence and then we've got one killer killing another killer and back and forth and back and forth, and at a certain point we, as a community, have to step in and just say, 'No. Stop killing in our streets. Stop endangering our children.'"
>
> Clay contends on appeal this was prosecutorial misconduct. But prosecutorial misconduct cannot be raised on appeal unless defense counsel objected on that basis in the trial court and requested an admonition. (*People v. Jackson* (2016) 1 Cal.5th 269, 349.) Here, defense counsel, otherwise a vigorous advocate, did neither. For that reason, Clay raises the issue as ineffective assistance of counsel. But before we address ineffective assistance of counsel, we must decide whether the prosecutor said anything that merited a defense objection.
>
> . . .
>
> Claims of prosecutorial misconduct are subject to differing federal and state standards of review. A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. In other words, the misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. "'When a prosecutor's intemperate behavior [or other misconduct] is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial

of due process, the federal Constitution is violated.'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.

. . .

We have no quarrel with Clay's recitation that prosecutors must not appeal to the passions or fears of the jury in seeking a conviction. (*Seumanu, supra*, 61 Cal.4th at p. 1342.) But we disagree that is what happened here. Clay accuses the prosecutor of making an emotional plea to convict him of murder as a means of taking a stand against gang violence in the Bay Area, relying largely on *United States v. Sanchez* (9th Cir. 2011) 659 F.3d 1252 for the proposition that a prosecutor "'may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.'" (*Id*. at p. 1256; *see also United States v. Monaghan* (D.C. Cir. 1984) 741 F.2d 1434, 1440–1443.) [FN] California also adheres to this rule. (*People v. Redd* (2010) 48 Cal.4th 691, 743, fn. 25.)

In *Sanchez*, the defendant was accused of importation and possession of cocaine, having been arrested at a California port of entry from Mexico after cocaine was found in his car. (*United States v. Sanchez, supra*, 659 F.3d at p. 1254.) Sanchez made statements as he was arrested indicating he wanted help because of a concern for his family's safety. (*Id*. at p. 1255.) At trial, he testified he acted under duress because drug traffickers had threatened his family if he did not drive the vehicle, and he did not go to the Mexican police because they "were corrupt and in the pocket of the drug traffickers." (*Ibid*.) The prosecutor stated in closing argument, "[W]hy don't we send a memo to all drug traffickers, to all persons south of the border and in Imperial County and in California—why not our nation while we're at it. Send a memo to them and say dear drug traffickers, when you hire someone to drive a load, tell them that they were forced to do it. [¶] Because . . . they'll get away with it if they just say their family was threatened. Because they don't trust Mexican police, and they don't think that the U.S. authorities can help them. Why don't we do that?" (*Id*. at p. 1256.)

The Ninth Circuit concluded the prosecutor's "send a memo" statement was improper because "the prosecutor was encouraging the jury to come to a verdict based not on Sanchez's guilt or innocence, but on the 'potential social ramifications' of the verdict." (*Sanchez, supra*, 659 F.3d at pp. 1256–1257.) In context, the prosecutor encouraged the jury to convict Sanchez—even if they believed his defense—because acquitting him would encourage others to rely falsely on the same defense. No similar message was conveyed to the jury in this case.

. . .

The risk presented in *Sanchez*—that the jury would convict based on extrajudicial considerations—was not present here. The first complained-of comment amounted to little more than the

unremarkable observation that gang violence is a big problem in Contra Costa County and surrounding areas. This was fully supported by the testimony of the law enforcement witnesses, and the prosecutor, in any case, was allowed to argue facts in common knowledge. (*Hill*, *supra*, 17 Cal.4th at p. 819.)

The second argument referring to Clay as an "OG" (old gangster) was backed up by evidence that Clay had been selling drugs since he was 19 years old, had illegal possession of a weapon when he killed Townsend, and had started a motorcycle club with Townsend (which the prosecutor claimed, and Clay admitted to Freier, had a "criminal element to [it]"). Clay had also organized a group called AFNF that had a paramilitary structure, and which the prosecutor portrayed as a gang. Clay recorded Video No. 36, in which he adopted gangster-style affectations and jive-talked about gunning someone down. Most significantly, on cross-examination the prosecutor asked Clay if he considered himself an "OG," and he said yes, later explaining his answer should not be understood literally. The conclusion that Clay was a gang member, although we find it weak in the context of the whole record, was within the prosecutor's wide discretion in arguing inferences from the evidence in closing argument. (*See Seumanu*, *supra*, 61 Cal.4th at p. 1330; *People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

The third argument by the prosecutor is the one closest to the "send a memo" argument involved in *Sanchez*. Recall she argued: "And the minute we start endorsing this kind of violence, you can see kinda what happens. It's like the violence begets violence and then we've got one killer killing another killer and back and forth and back and forth, and at a certain point we, as a community, have to step in and just say, 'No. Stop killing in our streets. Stop endangering our children.' " There can sometimes be a fine line between proper argument and misconduct. (*Compare United States v. Solivan* (6th Cir. 1991) 937 F.2d 1146, 1150–1155 [prosecutorial error found where prosecutor asked the jury to convict the defendant to "send a message" to other drug dealers] *with United States v. Alloway* (6th Cir. 1968) 397 F.2d 105, 113 [no misconduct in an armed robbery case where the prosecutor called on the jury to " 'speak out for the community' " and warn other criminals " 'this type of conduct will not be tolerated' "].) In this case, the prosecutor's remarks fell on the lawful side of the line.

To the extent the prosecutor tried to convince the jury this was a typical gang killing, we surmise her attempt was ineffectual. The evidence that Clay was a gang member was weak at best. Instead, the jury most likely understood they were being encouraged not to shy away from a murder verdict, despite any sympathy they might feel for Clay or hatred of Townsend. She urged them to avoid a comparison of Clay's character with Townsend's by emphasizing the negative evidence about Clay, but she did not steer them away from the evidence. Her references to "killing in our streets" and "endangering our children" were rooted in the evidence in that the killing occurred in the driveway of a store parking lot adjacent to a city street during regular business hours. Such a public execution by firearm naturally endangers bystanders, and in the parking lot of a 7–Eleven children could easily be present.

In urging the jurors not to "endors[e]" violence, she was not arguing why they should convict, but more precisely, why they should not acquit or reach a verdict less serious than murder based on sympathy alone. By emphasizing the violent and public nature of the crime, the prosecutor was not suggesting the jury send a message to others, take vengeance on Clay for the wrongdoing of others, use the verdict to solve some unrelated societal problem, or convict Clay because they might (but probably did not) believe he was a gang member. She was arguing that even understandably motivated vigilantism cannot be tolerated any more than a gang-on-gang killing. Such argument was not objectionable.

In any case, Clay has not shown how the remarks, in the context of the prosecutor's argument as a whole, were either deceptive or reprehensible. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1203.) Moreover, the trial court pre-instructed the jury at the outset of the trial not to base its decision on passion, prejudice, public opinion or public feeling, and warned that statements of counsel are not evidence. (*See* CALJIC No. 0.50.) The same advice was repeated in the instructions at the close of the evidence. (CALJIC Nos. 1.00 & 1.02.) The prosecutor's comments did not amount to misconduct. Having found no prosecutorial error, we conclude defense counsel was not ineffective for failing to object. (*E.g.*, *People v. Dickey* (2005) 35 Cal.4th 884, 915.)

. . .

But even if the prosecutor's closing remarks may be considered borderline and subject to objection, we find no ineffective assistance of counsel on this record. An attorney's failure to object is presumed to be tactical (*Strickland v. Washington* (1984) 466 U.S. 668, 689) and will rarely establish ineffective assistance. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 25 [" 'inherently tactical' "].) In this case it was demonstrably tactical as well.

Defense counsel did not sit by silently and allow the prosecutor to walk on his client. For instance, instead of objecting to the prosecutor's "OG" remark, defense counsel argued forcefully in closing that Clay was not a violent person, basing his argument in the evidence. Defense counsel also rebutted the prosecutor's "endangering our children" remark by pointing out that no children were shown to be in danger in this case.

On a more general level, the record strongly suggests this experienced defense attorney intentionally forfeited any objection that the prosecutor was appealing to the jurors' passions or prejudices in part because of his own plan to make an emotional plea to the jury. Given defense counsel's intention to call upon the jury to exercise mercy, and to rely upon emotion-provoking epithets against Townsend, [FN 10] the failure to object to any of the prosecutor's alleged misconduct shows itself to have been tactical. Had Serra objected to the prosecutor's arguments, it is likely his own passionate closing would have been curtailed. (*Cf. Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 317–318 & 322–324 (dis. opn. of Traynor, C.J.) [attorney misconduct even in civil case for counsel to appeal to passions of

jury].)

> FN 10: Defense counsel's closing to the jury included the following: "My client did not kill a human being.  He killed a human disease."  Counsel called Townsend "the most feared human being in Oakland," a "sociological psychopath," and a "sick animal mind," "without conscience, without feeling, without morality," who had "slaughtered" Willie.  He called Townsend a "sociopathic murderer, a homicidal killer, a serial killer of a fashion, serial killer for money," a "maniac," a "sick serial murderer," and a "mindless amoral killer."  If Clay had not killed Townsend, counsel argued, "it would have been done by others."  In contrast, he portrayed Clay as a "hunted animal" who suffered from PTSD, with "no way out," who killed in "an animal instinctual reaction" to Townsend's myriad described past provocations.  And he urged the jurors to judge the psychiatric testimony based on which expert spoke from their "heart," not their "head."

> Accordingly, counsel's failure to object did not amount to below-standard performance and Clay's ineffective assistance of counsel claim fails.  And in any case, the prosecutor's remarks were not so passion-provoking as to establish prejudice under the *Strickland* standard or any other.  (*Strickland v. Washington, supra,* 466 U.S. at pp. 693–696.)

*Clay*, 2018 WL 1735787 at *14–18.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, the defendant must establish "that counsel's representation fell below an objective standard of reasonableness."  *Id*. at 687–88.  Second, the defendant must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  On habeas review, it is not enough for a federal court to find counsel ineffective.  The federal court must also find that the state court's resolution of the issue was unreasonable, a higher standard.  *Harrington*, 562 U.S. at 101.

Regarding this issue specifically, federal habeas courts reviewing a claim that counsel was

26

1   ineffective for failing to object to improper statements at closing must be deferential to both

2   counsel's decision not to object and the state court's conclusion that that decision was reasonable.

3   *See id*. at 105.  Moreover, failure of counsel to object during closing argument "generally does not

4   constitute deficient performance," because "[a]bsent egregious misstatements, the failure to object

5   during closing argument and opening statement is within the wide range of permissible

6   professional legal conduct."  *Zapata v. Vasquez*, 788 F.3d 1106, 1115 (9th Cir. 2015) (citation and

7   internal quotation marks omitted).

8         The state court's decision was neither an unreasonable application of Supreme Court

9   precedent nor an unreasonable determination of the facts.  Parsing out the statements, the

10   prosecutor first stated that the offense "is exactly the kind of violence that is plaguing so many

11   areas of our county right now.  It's a culture killing, his business.  Violence is the commodity of

12   exchange."  Dkt. No. 22-27 at 178–79.  The identified comment by the prosecutor could

13   reasonably be found to be a permissible invitation to the jury to rely on matters within their

14   common knowledge, as it essentially amounted to a reflection on the current state of violence in

15   surrounding communities.  *See Henry v. Ryan*, 720 F.3d 1073, 1086 (9th Cir. 2013) (prosecutor's

16   reference to extraneous information unlikely to be prejudicial when it "fell within the common

17   knowledge of most jurors").

18         The state court found that the second statement referred to Petitioner as an "old gangster"

19   and characterized the killing as "the sort of gang style killing that is plaguing all the areas of our

20   county and nearby counties . . . ."  Dkt. No. 22-27 at 183.  As the state court appropriately noted,

21   this inference, while far from overwhelming, was supported by evidence adduced at trial.  *See*

22   *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) (explaining that "the prosecution

23   must have reasonable latitude to fashion closing arguments" and "[i]nherent in this latitude is the

24   freedom to argue reasonable inferences based on the evidence") (internal citations omitted).

25   Petitioner testified that the videos on his flip camcorder referenced old gangsters, and that he

26   considered himself an "OG".  Dkt. No. 22-25 at 193–94.  He testified that he sold cocaine from a

27   young age, carried a gun while selling drugs, and that the organization he founded, AFNF, had a

28   military structure.  *Id*. at 182, 192.  According to the defense gang expert, Daniel Vasquez, prison

United States District Court
Northern District of California

gangs are often structured along military lines.  Dkt. No. 22-22 at 119–20.  Insofar as a prosecutor is entitled to argue reasonable inferences from the evidence, the Court finds this statement within the bounds of permissible conduct.

Finally, Petitioner takes issue with the prosecutor's exhortation to the jury as follows:

> And the minute we start endorsing this kind of violence, you can see kinda what happens.  It's like the violence begets violence and then we've got one killer killing another killer and back and forth and back and forth, and at a certain point we, as a community, have to step in and just say, 'No.  Stop killing in our streets.  Stop endangering our children.'

Dkt. No. 22-27 at 189.

In general, a prosecutor "may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking."  *United States v. Sanchez*, 659 F.3d 1252, 1256 (9th Cir. 2011) (citation omitted).  This is because "[t]he evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence."  *Id.* (citation omitted).  It is important to note, however, that *Sanchez* is a Ninth Circuit decision, and the United States Supreme Court has never addressed this issue directly.  *See Parker v. Matthews*, 567 U.S. 37, 47 (2012) (admonishing the Sixth Circuit for relying on its own precedent, as opposed to Supreme Court precedent, to support its proposition that due process prohibits a prosecutor from emphasizing a defendant's motive to exaggerate exculpatory facts.)

In any event, the state court of appeals could reasonably find that the prosecutor's comments, taken in context, were not designed to inflame the jury, but to remind the jury that they were the arbiters of determining the boundaries of lawful behavior.  At closing, the prosecutor emphasized that the jury ought to find Petitioner guilty of first-degree murder and not be swayed by Townsend's propensity toward violence, or Petitioner's fear for his safety.  Dkt. No. 22-27 at 188.  With that backdrop, the prosecutor could have been telling the jury that a guilty verdict would send an appropriate message to the defendant himself, by holding him accountable for first-degree murder.  *See, e.g.*, *United States v. Gomez*, 725 F.3d 1121, 1132 (9th Cir. 2013) (no error where prosecutor told jury that it had "duty" to convict when read in context of closing argument).

1    Because the state court did not unreasonably find that there was no prosecutorial misconduct, it

2    was not unreasonable to conclude that counsel was not deficient in deciding not to object.  *See*

3    *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never

4    be deficient performance.")

5           In addition, to the extent the prosecutor's statements were objectionable, a thorough review

6    of the record confirms that the result would not have been different had counsel objected to the

7    prosecutor's argument.  *See Richter*, 562 U.S. at 112 (noting that to find prejudice for ineffective

8    assistance of counsel under *Strickland*, "[t]he likelihood of a different result" but for counsel's

9    performance "must be substantial, not just conceivable.")  The statement was one paragraph in a

10   lengthy closing argument and was unlikely to have swayed the jury.  *See Trillo v. Biter*, 769 F.3d

11   995, 1002 (9th Cir. 2014) ("The erroneous unrectified comment did not play a prominent role in

12   [petitioner's] trial, but instead was a single statement during a closing argument that took twenty

13   pages of transcript after a long criminal trial.").  The trial court also instructed the jury not to be

14   influenced by "passion, prejudice, public opinion, or public feeling."  Dkt. No. 22-27 at 107; *see*

15   *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("[a] jury is presumed to follow its instructions").

16   Finally, substantial evidence supported Petitioner's conviction.  As noted earlier in this Order,

17   there were numerous eyewitnesses to the shooting who repeatedly testified that Petitioner shot

18   Townsend without any noticeable provocation or exchange of threats.  Considering the

19   overwhelming evidence, counsel's failure to object to the prosecutor's statements at closing was

20   not prejudicial.  Because the state court's decision was not an unreasonable application of

21   *Strickland* or an unreasonable determination of the facts, Claim No. 4 is denied.

22                **4.   Claim No. 5: Prosecutorial Misconduct During *Voir Dire***

23          Petitioner argues that his due process rights were violated by the prosecutor's discussion of

24   legal concepts during *voir dire*, as well as her reference to irrelevant facts about Petitioner's life.

25   Dkt. No. 10 at 46.  Respondents contend that this claim is both unexhausted and meritless.  Dkt.

26   No. 21 at 53.  To the extent this claim is unexhausted, the Court may deny it on the merits.  *See* 28

27   U.S.C. § 2254(b)(2) ("an application for a writ of habeas corpus may be denied on the merits,

28   notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

United States District Court
Northern District of California

1     State.")  The California Court of Appeal laid out the facts as follows:[5]

2          The prosecutor commenced her voir dire by discussing with the panel
      of prospective jurors legal concepts that she deemed to be related to
3     the case and asking general questions about the jurors' understanding
      of those concepts and ability to abide by them.  Clay's trial counsel
4     objected to several of the prosecutor's statements on the grounds she
      was stating the law, misstating the law, preinstructing the jury, and
5     engaging in argument.  The court sustained some of defense counsel's
      objections and overruled others.  The passages of the prosecutor's
6     comments to which defense counsel objected can best be described as
      attempts to ascertain (1) if the prospective jurors would be able to
7     apply the law of self-defense as given to them; (2) if they could accept
      circumstantial evidence as proof of intent; (3) if they could afford to
8     Townsend the protection of the law in spite of his criminal history;
      and (4) whether evidence concerning marital infidelity or a love
9     triangle would cause them to have an emotional reaction.  These were
      not improper subjects of voir dire.
10
           At the end of the prosecutor's voir dire, defense counsel moved for a
11    mistrial, citing her abuse of voir dire by "introduc[tion of] topics of
      law and dare I say evidence or disguised evidence to in essence give
12    a preview of her perspective of evidence and law which I found to be
      incomplete and sometimes inaccurate."  Defense counsel complained
13    that giving the jurors some insight into a morally controversial topic
      (Clay's ongoing relations with more than one woman) was a "cheap
14    shot" "irrelevant to this case," interjected to "dirty him up."  The
      district attorney defended her use of voir dire, stating "there is
15    absolutely nothing wrong with the People covering legal principles in
      their voir dire.  And in fact, in ... this [case] it's essential."
16
           The court denied Clay's motion with the following comments: "I'm
17    going to deny the motion for mistrial.  And the reason I will is
      because, first, I agree that counsel are permitted to inquire of jurors in
18    voir dire whether they are able to follow the law that the Court will
      be giving them. [¶] For example, Mr. Serra, I assume you would want
19    to know if there was a juror on our panel who said, 'I don't care what
      the law in self-defense is.  I don't think it's ever justified.  So I'm not
20    going to apply it.'  That would be a fair question on your part. [¶] In
      addition to the question, you have to articulate the concept of the legal
21    principle so you can ask the juror whether they can follow the legal
      principle. [¶] I did overrule the objections when I thought the question
22    was—were perhaps designed to elicit that type of information. [¶] I
      granted or sustained the objection when I felt the questions went
23    beyond that and got into the facts of the case such as whether pointing
      a gun at somebody is justif[ied].  I sustained the objection to that. [¶]
24    So I sustained a number of objections on that basis, but I did permit
      inquiry generally to a juror's ability to follow the law or whether a
25    certain topic raises such an emotional response for a juror that they
      cannot be an objective juror. [¶] And the last point about the infidelity,
26    I did read portions of the motions.  I have not read everything, but I

27
      ─────────────────────
28    [5] The Court cites to the California Court of Appeal decision because it presents relevant
      background to Claim No. 5.

1
2
3
4
5
6
7
8

did read the portion that related to apparently the defendant's statement that did include the statement as described in the pleading at least that one of the reasons ... to get revenge from the victim having had an affair with one of his—the mother of his children. [¶] So that's why having know[n] this was an issue in this case, I permitted the inquiry.  And I didn't understand [the prosecutor's] response to be as you understood it, Mr. Serra, that she was protecting the defendant. [¶] I think she's concerned about a juror like [a named prospective juror] who might conclude that whatever the law is that it's okay for a man whose loved one has had an affair with another man.  It's okay for a man to shoot the man for having an affair with his loved one, because that may be a relevant issue in this case. [¶] So I didn't understand her to be disingenuous.  I understood her to be articulating the reason she asked that question.  And because of my knowledge that that was at least a potential significant issue in this case, I permitted the question. [¶] So the motion for mistrial is overruled."

9  *Clay*, 2018 WL 1735787 at \*18–19.

10      Prosecutorial misconduct rises to the level of a constitutional violation and thus warrants

11  habeas relief if it "so infected the trial with unfairness as to make the resulting conviction a denial

12  of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  *Darden* requires a two-step

13  inquiry: (1) whether the prosecutor's actions were improper and (2) if so, whether they "infected"

14  the trial and rendered it "fundamentally unfair."  *Drayden v. White*, 232 F.3d 704, 713 (9th Cir.

15  2000).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is

16  the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219

17  (1982).  Relief is limited to cases in which the petitioner can establish that the misconduct resulted

18  in actual prejudice, requiring the alleged error to have had a substantial and injurious effect or

19  influence on the verdict.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

20      Here, the prosecutor's statements during *voir dire* did not constitute misconduct.  A

21  prosecutor's arguments on the law "generally carry less weight with a jury than do instructions

22  from the court."  *Boyde v. California*, 494 U.S. 370, 384 (1990).  Such statements are viewed as

23  arguments, not evidence, and are therefore "likely viewed as the statements of advocates" as

24  opposed to "definitive and binding statements of the law."  *Id*.  The *voir dire* record establishes

25  that the prosecutor asked the prospective jurors about general legal principles, to ensure they could

26  follow the principles that would arise in the case.  Dkt. No. 22-29 at 96–135.

27      Moreover, the judge interjected, more than once, that it was the court's job to instruct on

28  the law:

United States District Court
Northern District of California

1

2

> Folks, the way this has worked and will work is that I will instruct you on the law at the end of the case, and it will cover all these issues in connection with this case and the multi-facets.
>
> . . .
>
> I do permit counsel to ask whether the jurors can follow the instructions that I will give and in order to evaluate that some description of the legal instructions is necessary.

3

4

5

Dkt. No. 22-29 at 100–01. The prosecutor then stated:

6

7

8

> [I]n this case and in every case where we go to a jury trial what will be given to jurors such as yourselves by the Judge at the end of the trial is all of the law that applies. And what I'm doing now is addressing some general legal principles.

9

*Id.*

10

     The trial judge repeatedly gave curative instructions throughout *voir dire*. In response to

11

an objection by defense counsel, the judge stated "[a]nd I want to remind everybody that the . . .

12

burden of proof is on the People. It is always on the People. It never shifts." *Id.* at 111. The

13

judge later stated, "[w]hat I think the fundamental point is that I will instruct you on the law . . ."

14

*Id.* at 112.

15

     The prosecutor later asked if any of the jurors "have a personal experience . . . involving

16

marital infidelity or a love triangle . . . that might make it difficult . . . to sit and listen to

17

everything in a case where those issues may come up?" *Id.* at 121. Defense counsel objected and

18

the judge overruled the objection. *Id.* This brief reference to marital infidelity, which was raised

19

to ensure any prospective jurors could apply the law despite evidence of possible infidelity, did

20

not render the trial fundamentally unfair. *Drayden*, 232 F.3d at 713. At the close of trial, the

21

judge stated: "[i]f anything concerning the law said by the attorneys in their arguments or at any

22

other time during the trial conflicts with my instructions on the law, you must follow my

23

instructions." Dkt. No. 22-27 at 107. In sum, this claim of prosecutorial misconduct during *voir*

24

*dire* fails because Petitioner is unable to demonstrate that any of the highlighted comments

25

actually constituted misconduct. Petitioner is denied relief on Claim No. 5. [6]

26

27

28

---

[6] The Court also notes that because *de novo* review is a more exacting standard than deference to the state court decision, Petitioner's claim would fail under either standard.

United States District Court
Northern District of California

### 5.   Claim No. 6: Cumulative Error

Petitioner contends that the cumulative errors of Claim Nos. 1 through 5 entitle him to

relief.  This claim was rejected in a concise opinion by the state appellate court:

> Having found no error, we also find no cumulative error.  Even if we consider assumed error cumulatively, it did not have a prejudicial impact on the verdict.  The evidence was unequivocal that Clay killed Townsend.  The only question was his state of mind at the time.  The jury received evidence suggesting he had good reason to fear Townsend and did fear him.  A properly instructed jury nevertheless convicted him of lying-in-wait first degree murder.  (§ 189.)  No borderline prosecutorial comments or evidentiary errors compromised the fundamental fairness of Clay's trial.  Any claimed errors, singly and cumulatively, were harmless.

*Clay*, 2018 WL 1735787 at *20.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

the cumulative effect of several errors may still prejudice a defendant so much that his conviction

must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing

conviction where multiple constitutional errors hindered defendant's efforts to challenge every

important element of proof offered by prosecution.)  Cumulative error is more likely to be found

prejudicial when the government's case is weak.  *See Thomas v. Hubbard*, 273 F.3d 1164, 1180

(9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th

Cir. 2002) (noting that the only substantial evidence implicating the defendant was the

uncorroborated testimony of a person who had both a motive and an opportunity to commit the

crime.  However, where only one (or no) single constitutional error exists, nothing can amount to

the level of a cumulative error.  *U.S. v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("one error is

not cumulative error").  Here, Petitioner has failed to demonstrate cumulative error as to Claim

Nos. 1 through 5.  This claim for habeas relief is denied.

### 6.   Claim No. 7: *Miranda* Violation

Petitioner argues that his Fifth Amendment rights were violated by the denial of his

*Miranda* motion and the admission of his confession to the police.  Dkt. No. 10 at 58.  Petitioner

raised this claim in his state habeas petition, and the California Supreme Court summarily denied

the claim.  As laid out below, Petitioner initially raised this issue in a motion to suppress, which

the trial judge granted in part and denied in part.  *See* Dkt. Nos. 22-2 at 238, 22-15 at 210.

In brief, the relevant background is as follows.[7]  After Petitioner surrendered to the police, he was taken into custody.  Detective Freier interviewed Petitioner about the shooting.  Dkt. No. 22-4 at 166.  Freier proceeded to fill out a personal history questionnaire with Petitioner.  *Id.* at 166–75.  Freier then explained that there was an extensive case and it was Petitioner's opportunity to talk.  *Id.* at 176–77.  She said "if we don't have a conversation tonight I'm not gonna understand what happened tonight," then commented that the man who got shot was not a good person and probably had something coming to him.  *Id.* at 179.  Freier explained that she wanted to have a conversation with Petitioner.  *Id.* at 181.  Freier read Petitioner his rights.  *Id.*  Petitioner said that he did not want to talk.  *Id.* at 182.  Freier responded "but if you just said that you didn't have anything to do with it I'm confused why you wouldn't wanna talk about it," and continued to question Petitioner about his decision to remain silent.  *Id.* at 182–84.  Freier then expressed her disappointment, explaining that there was extensive evidence against petitioner.  *Id.* at 184.  Petitioner repeatedly emphasized that he wanted an attorney.  *Id.*  Freier later gave Petitioner her business card and said that if Petitioner changed his mind, he could call her.  *Id.* at 188.

Later that evening, Freier woke Petitioner up and asked if he would consent to a search of Kesha Jones's house and vehicle.  *Id.* at 194.  Petitioner refused to grant consent, explaining that it was not his home or vehicle.  *Id.* at 196.

That same evening, Petitioner indicated to a female officer that he wanted to speak to Freier.  Dkt. No. 22-4 at 213.  Freier appeared, stating "[w]hat's up? . . . Take two on this one?" and Petitioner responded "[y]eah."  *Id.* at 214.  Freier then interviewed Petitioner a second time, stating "[b]efore you say anything – keeping in mind the rights that I read earlier to you . . . you thought you should talk to an attorney and didn't want to talk and now you are willing to talk?"  Dkt. No. 22-4 at 217.  Petitioner affirmed that he wanted to talk and provided Freier a detailed confession.  *Id.* at 217–65.  During the confession, Freier urged Petitioner to relay all the details of

---

[7]  The citations listed *infra* refer to transcripts of interviews conducted with Petitioner.  The Court has also independently reviewed the video and audio recordings of the interviews and relevant jail footage.  *See* Dkt. Nos. 22-38–41.  For ease of reference, the Court refers to the transcripts.

United States District Court
Northern District of California

the shooting.

As indicated above, the defense filed a motion to exclude Petitioner's statements to the police. Dkt. No. 22-2 at 238. The prosecutor filed a brief in opposition, and the trial court held an evidentiary hearing at which Freier testified. Dkt. No. 22-14 at 40. The trial judge granted the motion in part and denied it in part, explaining his ruling in a detailed decision:

> Factually I find based on all of the evidence submitted, and I won't obviously go through every factor, the transcript and the videos and audios speak for themselves, but I'll touch on some of the portions, but I find that Mr. Clay is a mature adult not a youth as some cases have considered, I believe he was 39 at the time of the interview. He has had prior substantial contact with the criminal justice system. As we discussed, he has been arrested I think well over a dozen times and has suffered seven prior convictions.
>
> I understand that he may not have previously taken a case to trial, but I have no doubt that he has previously been advised of his *Miranda* rights on a number of occasions.
>
> I find based on the review of all the evidence that all the contacts between Detective Freier and the other officers but it's primarily Detective Freier and the defendant were extraordinarily polite, calm, and respectful in both directions.
>
> That is, the police were very respectful of the defendant, and the defendant was very respectful of the police.
>
> He was at all times calm and unemotional, and other than toward the end of the interview number two, that there was no -- there was no anger or animosity displayed in either direction between the police and Mr. Clay. It was quite to the contrary.
>
> I found that the defendant was never threaten [sic], yelled at, belittled, browbeaten, or subject to covert forms of deceit.
>
> I don't find that the officer used any deception or trickery. In other words, they weren't falsely telling him they had evidence they didn't have, and they were generally accommodating to the defendant as far as offering water and providing it when requested and that sort of thing.
>
> As to the events of April 27th and 28th, I find the defendant was arrested at 2932 Lucena Way . . . at about 7:24 p.m.
>
> He was placed in a police car in front of the house for a brief period of time. There was a conversation there about other people in the house and in the defendant's car. There was no challenge to those answers – questions and answers.
>
> The defendant was taken to the Antioch Police Department for booking and incarceration at about 8:00 p.m. Detective Freier was

United States District Court
Northern District of California

1   assigned to interview the defendant, and I found that her testimony in
    the evidentiary hearing was credible.

2   She first spoke with a percipient witness for some period of time, and
3   then at about 9:45 p.m. she went to Mr. Clay's cell.  Mr. Clay was
    sleeping, so she woke him up, introduced herself, and told Mr. Clay
4   that she needed to speak with him.

5   The defendant responded that he did not even know what this was
    about, what this was all about, he did not know why he was there.
6   Detective Freier said that she would explain everything to him once
    they got to the interview room.

7   I find that Mr. Clay was in custody at all relevant times, so there's no
8   issue as to custody.

9   This particular statement, that is the initial request of the defendant
    that or statement that he didn't know why he was there, was not the
10  result of interrogation or the functional equivalent of an interrogation.

11  There was no question asked.  It was simply an introduction and a
    statement that she wished to talk to Mr. Clay, and obviously they were
12  on their way to the interview room or had not yet arrived in the
    interrogation room when he made that statement.  And she explained
13  that she would let him know once they got to the interrogation room.

14  I don't think there's any law that requires that one *Mirandize* a
    custodial defendant before they get to the interview room to begin the
15  interview.

16  Second, it was Mr. Clay who initiated this conversation and
    volunteered this statement that he did not know why he was there, so
17  it is spontaneous and not as a result of interrogation.  So I don't
    believe there's any basis for suppressing that statement.

18  . . .

19  Once they get to the interview room, Detective Freier asked Mr. Clay
20  a series of biographical questions from a personal history
    questionnaire.  She does routinely use this to obtain a thorough
    booking information.

21

22  Again, this conversation is not challenged, so the defendant's
    statements to the extent they're relevant are admissible.  They do fall
23  within the booking questions exception.

24  . . .

25  In the interview room after the booking questions were completed,
    Detective Freier then explained to the defendant why he was under
26  arrest.  She explained that she had a pretty extensive case, and she had
    had a lot of information, that she had reviewed Mr. Clay's rap sheet,
27  and that she knew that the decedent, Mr. Townsend, was not a good
    person and had something coming to him.

28  Mr. Clay does say that he is trying to understand what Detective

Freier was saying about him not being a good person and having something coming to him.  Detective Freier explained that they are investigating a shooting and arrested the defendant for being involved in a shooting.

The defendant responded, "I haven't shot no guns. I don't know anything about being involved in a shooting."  Again, that's a paraphrase.  The exact words are in the transcript and the audio and video.

Again, Detective Freier did not ask the defendant any question that led to that statement and has not to this point asked any questions about the event at all.

She was explaining to the defendant the reason he was under arrest and the nature of the investigation that she was about to interview him of.

After Mr. Clay said that, Detective Freier did not follow up and ask for further details.  She said that she intended to be fair to the defendant and to talk to the defendant in a way that protects both the defendant and her.

And then Mr. Clay started to speak, and she immediately cut him off and said, "Okay.  So just hear me out, okay?  And in your fairness, I'm going to read you your rights."

And so again up to this point, Detective Freier had not asked a single question about the events of that night.  She did explain the reasons that the defendant was under arrest, which he had inquired about, and the status of the investigation.  But I find that those statements are not interrogation.

They were not designed to elicit incriminating responses.  They were informing the defendant for the reason for his arrest and the circumstances under which the interview was about to take place.

. . .

I do believe the case law permits an officer who is speaking to a defendant in custody to explain the reasons for the arrest and the circumstances of the case before giving *Miranda* as long as they're not designed or likely to elicit incriminating comments or do not call for incriminating responses.

. . .

Therefore, I don't think that that statement by the defendant denying any involvement in a shooting was the result of interrogation and therefore not a violation of *Miranda*.

Before the defendant could go on, as I indicated, Detective Freier did interrupt him and advise him of his *Miranda* rights which was at approximately 10:00 p.m.

The warnings were clear and accurate.  They were given to Mr. Clay

in writing. The written form asked Mr. Clay if he understood them. He said yes. And asked whether he wished to speak to Detective Freier, and Mr. Clay initialed the box indicating no.

Detective Freier testified that she was confused by Mr. Clay initialing the "no" box, and I do credit that testimony. In other words, I don't think that she was lying about being confused.

I say that because it's apparent to me on the video that she was surprised at his no answer and felt it might have been a mistake by him of checking the wrong box because the entire conversation at this point suggested the defendant was interested in talking with her.

He had spoken freely throughout the personal history questionnaire. He had volunteered he knew nothing about the shooting. And his statements and conduct up to that point does indicate a willingness to talk.

So I think it's not unreasonable for Detective Freier to have been a little bit surprised and a bit confused when she saw the no box.

And again, the recording in my view reflects that sincere surprise on Detective Freier's point.

So she did seek to clarify Mr. Clay's response. She asked him if he meant to say no or if he wished to talk. And Mr. Clay did say unequivocally that he did not want to talk about the shooting. He said that several times. And in the discussion, he also indicated he wished to speak with counsel.

So my view is that up to the clarifying his – that he really does intend to say, "No, I don't want to talk," the detective I think was reasonable in clarifying that answer.

However, once Mr. Clay said twice or multiple times that he did not wish to speak and then he did wish to see a lawyer before speaking, I think Detective Freier did not scrupulously honor his right to *Miranda* rights at that point.

I understand the point that she did not ask him further questions, but I think the conversation that occurred after that did not honor the spirit of *Miranda* which *Edwards* does require that the interrogation stop when the defendant seeks counsel and the right to remain silent, and that was not done here.

So I am granting the defendant's motion to suppress any statements by the defendant using the People's Exhibit 3 from the *Miranda* hearing. The transcript of the first statement I would exclude page 15 line 661 to the end of the first interview.

. . .

I think the conversation should have stopped.

After the discussion, Detective Freier does respect eventually Mr.

Clay's *Miranda* rights and returns him to his jail cell.

She did provide him with her business card, because Mr. Clay had said several times that after talking with an attorney he may come back and talk with her.  So she gave him a business card for that purpose.

And then this next event is that Detective Freier's supervising sergeant asked her to seek consent from Mr. Clay to search his house at 2932 Lucena Way.  This occurred shortly after – I haven't found a specific time for this.

My view is that again I credit her testimony that she was asked by her sergeant to do this.  I don't believe this was a sham or an attempt to obviate the defendant's invocation of his *Miranda* rights.  I think it was – it was an attempt to comply with the law on search and seizure.  And I agree that the relevant point – this was the state of the law in 2009 when these events were occurring, not the clarification of the law since then.

But this does occur a couple years after *Georgia versus Randolph*, the Supreme Court case that said if two people's are – both of whom have possessory right to the residence and the one consents the other does not the police have to respect the unconsenting party's refusal to consent.

I understand the law now is clear and it might have been inferable that back then that a consenting homeowner or resident did not have the power to deny consent, but I don't think it was sufficiently clear.

I think the officers were acting in an abundance of caution trying to make sure that any search of the house was going to be a legal search.  And I can hardly fault them for trying to comply with the Fourth Amendment.

So I think they legitimately sought consent from Mr. Clay and did so because there was ambiguity at best at that time as to whether he was a resident at Lucena Way or not.

And I don't see any evidence in the transcript or anywhere else that this was a sham.  It seems to me it was a sincere effort to get a consent from the defendant.

And there was no attempt to reinterview, initiate the interview, there were no questions about the crime.  Just a discussion about whether or not Mr. Clay would consent or had property in the house.

So the fact that the officers ultimately decided to search the house even though the defendant declined to consent does not in my view suggest it was a sham, because Mr. Clay made it clear at least in his position that he had no possessory in the house and no possessions in the house.

And therefore I think the officers reasonably decided that they could go ahead with the consent of the only one who had the right to possess the house.

I would note that a request to consent to a search is not an interrogation within the meaning of *Miranda*.

And in any event, the defendant did decline to give his consent in this case, and he made no statements relating to the charges. So I don't think there's anything to suppress from the request for consent.

. . .

Getting to the second interview of Mr. Clay, at approximately 1:40 a.m. Detective Freier was leaving for work for the day to put her equipment in her desk and grabbed her purse and was stopping by the watch commander to let him or her know that she was leaving for the day.

While going through this, she passed by the booking area where you can see into the jail cells through a glass partition or door. And she can see Mr. Clay in his cell waving his arms with something in his hand and later – that later turned out to be her business card.

Detective Freier did call into the jail over the phone and asked that the jailer inside the cell area find out what Mr. Clay wanted. The jailer then reported back that the defendant said that he wanted to speak with Detective Freier, and that was communicated by the jailer to Detective Freier.

And then Mr. Clay was brought into the booking area where Detective Freier was standing observing him. There was some additional booking to be completed.

When it was completed, Detective Freier said to Mr. Clay, "What's up?" Mr. Clay said, "I need to talk to you." Detective Freier said, "Take two on this one?" And Mr. Clay said, "Yeah." So Detective Freier then got for her interview her tape recorder and so forth and Detective McMurray and brought Mr. Clay back into the interview room. It was the same interview room with the same officers, and it was about 1:45 a.m. That interview lasted about 45 minutes.

Mr. Clay was not cuffed during either of the interviews in the interview room.

Once they got to the interview room, Detective Freier spoke first and said, "Before you say anything, keeping in mind the rights that I read earlier to you," and the defendant says, "Yes, ma'am," Detective Freier continues, "Earlier you said that you thought you should talk to an attorney and didn't want to talk, and now you are willing to talk?" And Mr. Clay responded, "Yes, ma'am." Detective Freier said, "Without an attorney present?" And Mr. Clay said, "Yes, ma'am."

Detective Freier said, "Okay. Let's break it down. Tell me what happened." Mr. Clay said, "I'm going to tell you the truth and God have mercy on my soul." Detective Freier said, "Thank you. Okay." Mr. Clay said, "And please could you all work with me to get me back home to my family?"

Detective Freier said, "Just tell the truth. That's your best." And the defendant interrupted and said, "I killed that motherfucker because he killed my son and he was going to kill me."

And then the defendant went on to explain in great detail his relationship with Mr. Townsend, the circumstances that led up to the shooting, and the reason ns the defendant felt that it was necessary to shoot Mr. Townsend. I won't detail that because it's all in the transcript.

Officer – I'm sorry. Mr. Clay did advise the officers in this process that he had prayed about the decision to talk to them, that he wanted to clear his conscience as reflected by his starting the conversation with, "God have mercy on my soul."

He did ask the officers for mercy to get back to see his family. He did thank the officers at the end using the words, "You all did me very well," on page 48 of Exhibit 10. "I appreciate you guys."

On page 49 of Exhibit 10, he described having called on his deceased mother, meaning that he essentially contemplated with her and kind of impersonally had a conversation with her on the issue of whether to talk to the police and cleared his conscience.

The police officers, when the defendant initially indicated his willingness to talk, I think acted entirely appropriate by reminding him of his rights, reminding him that he had invoked his right to counsel before speaking, and clarifying that what he wished to do now was to waive those rights and speak to the officers.

So I don't think there's any inappropriate behavior in that clarifying that I think they were required to do that.

So I do find based on all the evidence that the defendant reinitiated the interview on his own volition. He did so voluntarily and with the understanding that he had the right to remain silent and had the right to speak with an attorney first.

Understanding those rights, he waived them for the second interview knowingly, voluntarily, and intelligently.

I find that he was motivated by a fear to get these things off his chest and to clear his conscience. He did so because he had prayed, had thought of his deceased mother, and by introspection concluded that he was better off admitting what happened and the reasons he shot Mr. Townsend to the police.

Now, I did find that Detective Freier had failed adequately to terminate the first interview in a timely fashion when the defendant had clearly invoked.

But I do not find that the defendant's reinitiation was the result of Detective Freier's statements after he invoked on the first interview.

I find that he reinitiated because he had thought about it, contemplated

1   it, prayed, and made his own decision that he wanted to talk to the officers.

2   So I say that for a number of reasons.

3   First, throughout the entire first interview, Mr. Clay once advised of his rights was consistent and steadfast and unwavering in his desire not to talk with the officers and to speak with an attorney first.

4

5   And despite Detective Freier's statements after the invocation, he never wavered from that, which demonstrated he has the ability to invoke and maintain that invocation.

6

7   Now, I want to address specifically Detective Freier's statement in the first interview after the invocation that is of concern to the defense.

8

9   She did say and I quote, "You can have an attorney present.  You know that.  You can be quiet.  That's your choice.  Okay."  Just think – excuse me.  "I just think at some point you're going to have an attorney and they're going to say don't talk to the police.  And this is going to go to court, and you will not have a word out of your mouth explaining what happened."

10

11

12   I do not believe that that is reasonably interpreted to suggest to the defendant and I don't believe that the defendant understood it to mean that he would be forever precluded from articulating his defense or his reasons for shooting Mr. Townsend or precluded from testifying in court.  The word's simply don't say that and I don't think they imply that.

13

14

15

16   I think it's clear that what she's saying is that, "This is your opportunity to tell us what happened.  And if an attorney tells you not to speak, then that opportunity will be missed."

17

18   But I don't think it's a reasonable interpretation to conclude that Detective Freier's words meant that he would be precluded from testifying once he got to court, and I don't believe the defendant interpreted [ ] it that way based on what I saw on the tape and transcript.

19

20

21   That finding is based on Detective Freier's testimony which I credited describing the interaction, the tone of voice, the tone or tenor of the conversation, which is also clear from the video and audio.

22

23   And I found that the defendant had at no point made reference to that when he gave his second statement.  In other words, he didn't make any suggestion that he was – had changed his mind to speak to the lawyers – or excuse me – to the officers because he felt this would that he would be precluded from doing so at trial or at any other time.

24

25

26   So I don't find any evidence that the transcripts in Mr. Clay's word to suggest that that was his motivation.

27

Dkt. No. 22-15 at 213–29.

28

42

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during a custodial interrogation can be admitted in evidence.  "[I]nterrogation means questioning or 'its functional equivalent,' including 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Pope v. Zenon*, 69 F.3d 1018, 1023 (9th Cir. 1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  The focus is on the "perceptions of the subject, rather than the intent of the police." *Innis*, 446 U.S. at 301. However, when an officer is engaged in actions which are normally attendant to arrest and custody, questions fall under the booking exception to *Miranda*.  *See Kemp v. Ryan*, 638 F.3d 1245, 1256 (9th Cir. 2011).

A state court's decision that there was no interrogation under *Miranda* is entitled to deference on federal habeas review under 28 U.S.C. § 2254(d).  A petitioner must show either (1) that the state court's decision was an unreasonable application of clearly established Supreme Court precedent, or (2) that its decision rested on an underlying unreasonable determination of fact.  *Hernandez v. Holland*, 750 F.3d 843, 852–53 (9th Cir. 2014).

Because the California Supreme Court summarily denied this claim, the Court will refer to the trial judge's ruling as the last reasoned state court decision.  *See Ylst*, 501 U.S. at 803–04.  The judge's decision did not amount to an unreasonable application of *Miranda* and its progeny. Petitioner contends that after he invoked his right to an attorney, Detective Freier violated that right by later seeking his consent to search the Lucena residence.  Dkt. No. 10 at 60.  He argues that it was Detective Freier's later approach that caused him to "contemplate waving his rights[.]" *Id*. at 61.  He also contends that Detective Freier coerced his confession when she asserted, during the first interview, that he would not have an opportunity to explain what transpired if he did not speak with her at that time.  *Id*.

The trial court reasonably found that the request for consent to search the Lucena residence was not "interrogation" within the meaning of *Miranda*.  *See United States v. Plumes*, 908 F.2d

United States District Court
Northern District of California

United States District Court
Northern District of California

978 (9th Cir. 1990) ("a request for consent to search is immeasurably far removed from custodial interrogation so advising a suspect of his or her rights is not a prerequisite to such a request.") (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 232 (1973) (internal quotation marks omitted); *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993) ("[e]very federal circuit court which has addressed the *Miranda* issue presented here has reached the conclusion that a consent to search is not an incriminating statement."); *Dotson v. Lewis*, No. C 01-4048 PJH (PR), 2006 WL 862946, at *4 (N.D. Cal. Mar. 31, 2006) (finding no *Miranda* violation where petitioner invoked his right to have an attorney present, and "thirty minutes later the officers asked for permission to search petitioner's home . . . which petitioner gave.").  As detailed by the trial court and reflected in the record, when Detective Freier approached Petitioner for consent to search, she did not question Petitioner about the shooting, nor did Petitioner provide any information related to the offense.  Dkt. No. 22-4 at 194–97.  Thus, the trial court's ruling on this matter was not an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts.

Turning to the second interview, Petitioner contends that his confession was coerced by Detective Freier's misleading statements.  Specifically, he takes issue with the following statement: "I just think at some point you're going to have an attorney and they're going to say don't talk to the police.  And this is going to go to court, and you will not have a word out of your mouth explaining what happened."  Dkt. No. 22-4 at 184.

The trial court reasonably found nothing in the record to indicate that Petitioner chose to speak with Detective Frier because of her statement, or any other form of coercion.  The trial court noted that Petitioner made no reference to Detective Freier's statement, nor did he indicate that he was speaking for fear that he would not have an opportunity to confess later.  The trial court reasoned that Petitioner "reinitiated because he had thought about it, contemplated it, prayed, and made his own decision that he wanted to talk to the officers."  Dkt. No. 22-15 at 227.  Based on the video recordings and transcripts of the interviews, the trial court did not unreasonably conclude that Petitioner willingly confessed to the shooting.  The state court's decision denying this claim was not an unreasonable application of *Miranda* or an unreasonable determination of

1    the facts.  Petitioner is denied relief on Claim No. 7.

2              **7.   Claim No. 8: Failure to Call an Expert**

3              In Claim No. 8, Petitioner appears to argue that the prosecutor engaged in misconduct by

4    failing to present a gang expert to testify that Petitioner was a member of a gang.  Dkt. No. 10 at

5    66–73.  He explains that the prosecutor repeatedly made statements indicating that Petitioner was

6    a gang member, inflaming the jury, but failed to ultimately present an expert to confirm

7    Petitioner's alleged gang affiliation.  *Id.*  Petitioner also argues that his trial and appellate counsels

8    were ineffective in failing to address this issue.  *Id*. at 73.  Petitioner raised this claim in his state

9    habeas petition and the California Supreme Court summarily denied this claim.

10             Prior to trial, the prosecutor retained an expert to give an opinion on whether AFNF

11   constituted a gang.  Dkt. No. 22-14 at 180–81.  The prosecutor explained that Petitioner's gang

12   affiliation was relevant, particularly if the defense sought to introduce evidence of Townsend's

13   gang affiliation.  *Id*. at 182.  The trial judge later ruled that he would allow the prosecutor to

14   present a gang expert, explaining:

15                  [I]f the People have a witness who is qualified to testify as a gang
                    expert and rendered an opinion based on evidence that he has
16                  reviewed, that the defendant -- the documents seized from the
                    defendant in custody and from the legal mail reflect membership in a
17                  gang, then the People are entitled to present that evidence in response
                    to the defense's evidence[.]
18
19                  . . .

20                  And if the defense offers that evidence, then I'm likely to admit the
                    People's proffered evidence relating to the defendant's alleged
21                  membership in a gang.

22   *Id*. at 185, 187.

23             At trial, the prosecutor did not present a gang expert.  She did, however, question various

24   witnesses about AFNF, as well as their membership in various gangs.  *See, e.g.*, Dkt. No. 22-23 at

25   59, 116.  The prosecutor also questioned Petitioner about AFNF and its bylaws, as well as his

26   reference to old gangsters in his videos.  Dkt. No. 22-25 at 188–93.  At closing the prosecutor

27   stated:

28                  The bottom line is this case is not about BGF.  And it's not about this
                    AFNF either.  It's not about if AFNF is a nonprofit corporation or not,

> if they only accept people who don't associate with people who do violence.  It's not about if they just happen to have a military structure and everyone uses monikers and they have a death -- oath of death before dishonor and they recruit from in custody and they run an escort service.  You can consider those things about credibility if you really believe the defendant, but it's not even about that.
>
> This is one OG killing another OG over a personal beef.  That's what this is.  That's what this case is, plain and simple.

Dkt. No. 22-27 at 183.

Petitioner appears to argue that the prosecutor's repeated reference to gangs rendered the trial fundamentally unfair.  As previously explained, a defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Darden*, 477 U.S. at 181. While a prosecutor may not make statements of fact not supported by evidence, he or she may suggest to the jurors that they make "reasonable inferences" from evidence that is presented during trial.  *See United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) (confirming that prosecutors are allowed "wide latitude" in closing argument, including "latitude that embraces reasonable inferences from the evidence presented at trial") (internal quotation marks and citations omitted).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (quotation marks and citation omitted).

A review of the record establishes that the prosecutor did not engage in misconduct by questioning the witnesses about AFNF or their gang affiliation.  The defense sought to raise the issue of the victim's gang affiliation, and the trial judge ruled, under California state law, that the prosecutor was permitted to raise the issue of Petitioner's alleged gang affiliation:

> If the defense offers evidence under 1103(a), then that does trigger the People's right to offer counterevidence, or evidence of the defendant's character traits for violence and so forth.
>
> So the bottom line for me is that I do believe the defense is entitled to present evidence of Mr. Townsend's character for violence, including alleged membership in the Black Guerilla Family.  And if the defense does so, then the People are entitled to present evidence of the defendant's character for violence.

Dkt. No. 22-14 at 185.

46

Petitioner points to every instance in the record where the prosecutor questioned witnesses about gangs, but fails to show how any of these instances rendered the trial fundamentally unfair. The prosecutor was within her right to raise this issue, based on the trial judge's ruling.  The prosecutor herself said in closing that the issue of gangs was tangential.  And as previously explained, to the extent the prosecutor insinuated that AFNF was a gang, that was a reasonable inference based on the testimony.  *See Molina*, 934 F.2d at 1445.

Next, to the extent Petitioner is arguing that the prosecutor engaged in misconduct by failing to call a gang expert, that argument fails.  This Court has found no Supreme Court case law, nor has Petitioner pointed to any, which stands for the proposition that a party must present an expert witness after that party represents that it might.

Finally, insofar as Petitioner's underlying claim of prosecutorial misconduct lacks merit, his claims of ineffective assistance of counsel are similarly meritless.  *See Rupe*, 93 F.3d at 1445. Based on the foregoing, the state court's summary denial of this claim was neither an unreasonable application of Supreme Court precedent, nor an unreasonable determination of the facts.  Claim No. 8 is denied.

### 8.   Claim No. 9: Admissibility of Evidence

Petitioner argues that his constitutional rights were violated when the trial court refused to admit an FBI joint task force report as evidence of Townsend's affiliation with the Black Guerilla Family.  Dkt. No. 10 at 81.  This claim was raised in Petitioner's state habeas petition, and the California Supreme Court summarily denied this claim.

As relevant background, the defense retained Daniel Vasquez, an expert in prison gangs, particularly BGF.  Dkt. No. 22-15 at 112.  Vasquez was provided joint task force reports to use in forming his opinion that BGF is violent and Townsend, as a member of BGF, must also have been violent.  *Id*. at 112–13.  With respect to the expert testimony, the trial judge ruled:

> I will permit them [experts] to list the items they reviewed but not to elicit hearsay content from those items, such as, the FBI reports from the 1990s are purely hearsay and therefore I'm not going to permit either expert to elicit the content of what they read or reviewed as opposed to describing what they read or reviewed in general terms and in rendering an opinion.

. . .

> So I'm going to carefully limit what the experts can articulate as the basis of their opinion to the extent it's based on hearsay.

Dkt. No. 22-14 at 187.

Defense counsel recognized that the joint task force investigation contained hearsay, but argued that the report was not being admitted for its truth, but to establish the basis for Vasquez's opinion. Dkt. No. 22-15 at 114. The judge responded:

> I do have a concern, as I mentioned in my ruling on the gangs, that I believe I have a gatekeeping responsibility to prevent rank hearsay from being presented to the jury. And I think the best example is the reports from what you described as the joint task force. Those reports say that FBI agents spoke to a B and E agent[8] who say that word on the street is that Gary Lloyd Townsend murdered 20 people. So we have three layers of hearsay, the original source of which is rumors on the street. That couldn't be any less reliable hearsay, despite how many times it was repeated and how many people believed it was true. It's nothing but rumor handed from one agent to another to another and put in a report.

*Id*. at 115. The judge later explained, "Vasquez is an expert and can rely on hearsay. I'm allowing limited hearsay through Vasquez but not opening all the doors to the rumors and all the hearsay reports." Dkt. No. 22-16 at 47.

At trial, the defense presented Vasquez as an expert regarding BGF. Dkt. No. 22-22 at 97. He testified about BGF's history, as well as the violence and murder committed by BGF. *Id*. at 98–100. He testified that in forming his opinions, he relied on, among other materials, federal task force reports that investigated Townsend's affiliation with BGF. *Id*. at 105–06. Vasquez explained that the target of the joint task force was Townsend, and he was considered very dangerous. *Id*. 114–15. He later testified that Townsend was a confirmed member of BGF. *Id*. at 115.

The defense also called Russel Giuntini, a career prosecutor, who testified that he was part of the joint task force that investigated Townsend. *Id*. at 152. Giuntini explained that Townsend was the number one target of the investigation because he had the greatest reputation for violence. *Id*. at 154.

---

[8] The Court assumes this reference should be to "BNE," *i.e.*, the California Bureau of Narcotics Enforcement.

48

1    To the extent Petitioner is arguing that the trial court erred in its evidentiary ruling, this

2    argument is not proper for federal habeas review.  *See Swarthout*, 562 U.S. at 219.  Even if the

3    claim is cognizable in federal habeas, the state court's summary denial of this claim was not

4    unreasonable.  "[S]tate and federal rulemakers have broad latitude under the Constitution to

5    establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303,

6    308 (1998).  In limited circumstances, however, the exclusion of crucial evidence may violate the

7    Constitution.  *See Holmes v. South Carolina*, 547 U.S. 319, 319 (2006) ("[w]hether rooted directly

8    in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or

9    Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a

10   meaningful opportunity to present a complete defense") (citations and internal quotations

11   omitted); *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004) ("The Supreme Court has made it

12   clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the

13   Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a

14   defense.") (citations and internal quotations omitted).  Nevertheless,

15          [w]hile the Constitution [ ] prohibits the exclusion of defense
            evidence under rules that serve no legitimate purpose or that are
16          disproportionate to the ends that they are asserted to promote, well-
            established rules of evidence permit trial judges to exclude evidence
17          if its probative value is outweighed by certain other factors such as
            unfair prejudice, confusion of the issues, or potential to mislead the
18          jury.

19   *Holmes*, 547 U.S. at 326.  In deciding if the exclusion of evidence violates the due process right to

20   a fair trial or the right to present a defense, the court balances the following five factors: (1) the

21   probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is

22   capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely

23   cumulative; and (5) whether it constitutes a major part of the attempted defense.  *Cambra*, 360

24   F.3d at 1004 (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).  A federal court can

25   disturb on due process grounds a state court's evidentiary ruling only if the ruling was arbitrary or

26   so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d 1355,

27   1357 (9th Cir. 1995).

28          The Court finds that Petitioner's Fifth or Sixth Amendment rights were not violated by the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    exclusion of the FBI report.  The record confirms that the trial court did not arbitrarily exclude the

2    FBI report: the report was riddled with hearsay and was of limited probative value.  Vasquez was

3    permitted to rely on the report in forming his opinions, and the record confirms that he did.

4    Giuntini also testified about the contents of the report and its connection to Townsend.  And while

5    the report may have been helpful to Petitioner's defense, the fact that Vasquez and Giuntini were

6    permitted to reference the report and refer to its contents indicates that the exclusion of the report

7    was harmless.  *See Brecht*, 507 U.S. at 637.

8         Petitioner also makes a one-line argument that his appellate attorney was ineffective in

9    failing to raise this issue.  *See* Dkt. No. 10 at 89.  Claims of ineffective assistance of appellate

10   counsel are reviewed according to the standard set out in *Strickland*.  *See Smith v. Robbins*, 528

11   U.S. 259, 285 (2000).  To prevail on such a claim, the petitioner must show: (1) that counsel's

12   performance was objectively unreasonable, i.e., that counsel acted unreasonably in failing to

13   discover and brief a merit-worthy issue; and (2) the petitioner must demonstrate a reasonable

14   probability that, but for appellate counsel's failure to raise the issue, the petitioner would have

15   prevailed in his appeal.  *Id.* at 285–86.

16        Insofar as Petitioner has failed to demonstrate that the exclusion of the FBI report violated

17   his constitutional rights, he cannot show that his appellate counsel's failure to raise the issue on

18   appeal constituted ineffective assistance of counsel.  Counsel's failure to raise a meritless

19   argument does not constitute ineffective assistance of counsel.  *See Rupe*, 93 F.3d at 1445.

20   Because Petitioner cannot show that he was prejudiced by appellate counsel's failure to include

21   this meritless issue in his appeal, he fails to state a cognizable claim for ineffective assistance of

22   appellate counsel.  Because the state court's summary denial of this claim was not unreasonable,

23   relief is denied on Claim No. 9.

24        **III.    CONCLUSION**

25        For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

26        A certificate of appealability will not issue because reasonable jurists would not "find the

27   district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*,

28   529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States

1    Court of Appeals.

2         The Clerk shall enter judgment in favor of Respondents and close the file.

3         **IT IS SO ORDERED.**

4    Dated:   6/10/2021

5    

6    HAYWOOD S. GILLIAM, JR.
     United States District Judge